James H. Lister (AK Bar 1611111)
Brian V. Gerd (AK Bar 1810097)
Birch Horton Bittner & Cherot, P.C.
1100 Connecticut Ave., NW, Ste. 825
Washington, D.C. 20036
(202) 862-8368 (Tel.)
(202) 659-1027 (Fax)
jlister@bhb.com, bgerd@bhb.com

*Attorneys for Alaska Professional Hunters Association and
Sportsmen's Alliance Foundation*
*See signature page for additional party and counsel names*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA WILDLIFE ALLIANCE et al., <br>      Plaintiffs, <br><br>   v. <br><br> DEBRA HAALAND et al., <br>      Federal Defendants, <br><br>   & <br><br> SAFARI CLUB INTERNATIONAL, ALASKA PROFESSIONAL HUNTERS ASSOCIATION, SPORTSMEN'S ALLIANCE FOUNDATION, and STATE OF ALASKA, <br><br>      Intervenor-Defendants. | Case No. 3:20-cv-00209-SLG |

## INTERVENOR-DEFENDANTS' SUMMARY JUDGMENT BRIEF
## (LOCAL RULE 16.3)

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

A.   Introduction ..................................................................................................... 1

B.   Standard of Review ......................................................................................... 3

C.   Factual Background ......................................................................................... 4

D.   In the Absence of Conflicting "Federal Law" or Regulation, Alaska
     Law Controls; 16 U.S.C. §3201 Specifically Confirms this is True for National
     Preserves in Alaska ........................................................................................ 5

E.   Plaintiffs Fail to Identify Federal Statutes Compelling NPS to Preempt ........ 8

F.   Legislative History and Policy Manuals Do Not Compel Preemption ........ 14

G.   NPS Acted Reasonably and Within the APA's Bounds in Declining to
     Preempt .......................................................................................................... 20

     1.   Preemption of State Hunting Regulations Are Not Related to a "Predator
          Reduction Effort"…………………………………………...………... 20

     2.   Hunting Bears Over Bait is an Accepted Practice………………………23

     3.   Extended State Hunting Seasons for Wolves and Coyotes are not
          Preempted……………………………………….………………………26

     4.   Taking Black Bear with Artificial Light at Den Sites is a Traditional
          Practice……………………………………………………………………27

     5.   Using Dogs to Hunt Black Bear is an Established Practice in Limited
          Situations……………………………………………………………..…30

     6.   Taking Swimming Caribou or Taking Caribou from Motorboats under Power
          is an Established Practice in Certain Situations…………………………30

H.   NPS Fully Explained its Change of Position………………………………….31

I.    Public Law 115-20 Supports NPS's Decision to Repeal the 2015 NPS Rule……………………………………………………………………34

    1.  Public Law 115-20 is the Most Recent Expression of Congressional Intent…......................................................................................................35

    2.  Public Law 115-20 Bars the Adoption or Re-adoption of a Substantially Similar Rule……………………………………………………...39

    3.  Public Law 115-20 also Bears Upon NPS's Motion for Remand Without Vacatur which Intervenors Support……………………………….41

Conclusion………………………………………………………………...43

Certificate of Compliance………………………………………………44

Certificate of Service………………………………………………...44

# TABLE OF AUTHORITIES

## CASES

*Abrego v. The Dow Chemical Co.*,
443 F.3d 676 (9th Cir. 2006) ............................................................................ 16

*All. for the Wild Rockies v. Salazar*,
672 F.3d 1170 (9th Cir. 2012) .......................................................................... 35

*Ctr. for Biological Diversity v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019) ............................................................................ 35

*Ctr. for Biological Diversity v. Zinke*,
313 F. Supp. 3d 976 (D. Alaska 2018), aff'd, 946 F.3d 553 (9th Cir. 2019) .................. 34

*Fox Television v. F.C.C.*,
556 U.S. 502 (2009) .................................................................................... 32-34

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016) ........................................................................ 35

*Fund for Animals v. Mainella*,
294 F. Supp. 2d 46 (D.D.C. 2003) ..................................................................... 14

*Fund for Animals v. Thomas*,
932 F. Supp. 368 (D.D.C. 1996) .................................................................. 24, 26

*Geer v. Connecticut*,
161 U.S. 519 (1896) ......................................................................................... 5

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ......................................................................................... 2

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ......................................................................................... 5

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ................................................................................... 5, 7, 9

*La. Pub. Serv. Comm'n v. F.C.C.*,
476 U.S. 355 (1986) ......................................................................................... 7

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) ........................................................................ 20

*Metlakatla Indian Cmty. v. Egan*,
369 U.S. 45 (1962) ....................................................................... 5, 6

*Ninilchik Traditional Council v. United States*,
227 F.3d 1186 (9th Cir. 2000) ........................................................ 4

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) ........................................................ 16

*Organized Vill. of Kake v. USDA*,
795 F.3d 956 (9th Cir. 2015) ......................................................... 4

*Pullen v. Ulmer*,
923 P.2d 54, (Alaska 1996) ........................................................... 5

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) ....................................................... 17

*River Runners for Wilderness v. Martin*,
593 F.3d 1064 (9th Cir. 2010) ................................................. 17, 18

*Sacora v. Thomas*,
628 F.3d 1059 (9th Cir. 2010) ...................................................... 26

*Safari Club Int'l v. Haaland*,
31 F.4th 1157 (9th Cir. 2022) ................................................... 2, 26

*Steinle v. City & Cnty. of San Francisco*,
919 F.3d 1154 (9th Cir. 2019) ................................................. 15, 16

*Sturgeon v. Frost*,
139 S. Ct. 1066 (2019) ................................................................... 8

*Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ................................................... 4, 30

*Watersheds Project v. Salazar*,
766 F. Supp. 2d 1095 (D. Mont. 2011) ......................................... 17

*West v. Bd. of Game*,
248 P.3d 689 (Alaska 2010) ............................................................... 6

*Wyoming v. United States*,
279 F.3d 1214 (10th Cir. 2002) ........................................................ 2, 3

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
141 S. Ct. 2434 (2021) ...................................................................... 8

**STATUTES**

5 U.S.C. § 706(2) ........................................................................... 3, 4

5 U.S.C. § 801 ................................................................. 34, 38, 39, 41

16 U.S.C. §§ 410hh, 410hh-1, and 410hh-2 ............................... 10, 11

16 U.S.C. § 3101(b) ......................................................................... 10

16 U.S.C. § 3102 .............................................................................. 35

16 U.S.C. § 3125 ......................................................................... 10, 11

16 U.S.C. § 3201 ................................................................ 2, 5, 8, 13

16 U.S.C. § 3202 ................................................................... 8, 10, 40

16 U.S.C. § 3204 .............................................................................. 14

54 U.S.C. § 100752 .......................................................................... 12

54 U.S.C. § 100101(a) ....................................................................... 9

Alaska Const. art. VIII, § 2, 4 ............................................................ 6

Alaska Statute 16.05.010 ................................................................... 7

Alaska Statute 16.05.050(a)(19) ........................................................ 7

Alaska Statute 16.05.221(b) .............................................................. 7

Alaska Statute 16.05.255 ............................................................ 7, 9, 15

Alaska Statute 16.05.950 ............................................................................ 7

Pub. L. No. 85-508, 72 Stat. 339 (1958) ................................................ 6, 7, 8

Pub. L. No. 115-20, 131 Stat. 86 (2017) ................................................ *passim*

**REGULATIONS**

36 C.F.R. § 242.5 ...................................................................................... 28

36 C.F.R. §§ 13.42 (2015) .............................................................. 9, 14, 40

43 C.F.R.§§ 24.1-24.7 ...................................................................... 2, 12, 27

43 CFR § 24.4(h)(3) ................................................................................. 27

Executive Order 10857, 25 Fed. Reg. 33 (1959) ........................................ 6, 8

47 Fed. Reg. 46,147 ................................................................................. 13

48 Fed. Reg. 11,642 ................................................................................. 13

60 Fed. Reg. 14,720 ................................................................................. 23

80 Fed. Reg. 64,325 ...................................................................... 1, *passim*

81 Fed. Reg. 27,030 .................................................................................... 4

81 Fed. Reg. 52,248 ...................................................................... 4, *passim*

83 Fed. Reg. 23,621 ................................................................................. 19

85 Fed. Reg. 35,181 ...................................................................... 1, *passim*

Article 5 Alaska Administrative Code Chapter 92 .............................. 28, 30, 31

**OTHER AUTHORITIES**

163 Cong. Rec. H1260 (Feb. 16, 2017) (remarks of Rep. Young) .................... 37

163 Cong. Rec. S1864-65 (Mar. 21, 2017) (remarks of Sen. Sullivan) ............. 37

163 Cong. Rec. S1868 (Mar. 21, 2017) (remarks of Sen. Murkowski) .............. 36, 37

Adam M. Finkel & Jason W. Sullivan, *A Cost-Benefit Interpretation of the "Substantially Similar" Hurdle in the Congressional Review Act: Can OSHA Ever Utter the E-Word (Ergonomics) Again?*, 63 Admin. L. Rev. 707, 732 n.122. ........................................ 38

NPS Management Policies 2006 .................................................................................. 18, 19

Rep. Henry Hyde, *Congressional Record*, daily edition, vol. 142 (Apr. 19, 1996), p. E577 .................................................................................................................. 45

THE CONGRESSIONAL REVIEW ACT (CRA): FREQUENTLY ASKED QUESTIONS 20 (Nov. 12, 2021) .................................................................................................. 45

**INTERVENOR-DEFENDANTS' SUMMARY JUDGMENT BRIEF**

Intervenor-Defendants Alaska Professional Hunters Association, Sportsmen's Alliance Foundation, Safari Club International, and State of Alaska (collectively, "Intervenors") respectfully submit this summary judgment brief urging the Court to affirm the agency action challenged in this judicial review case and in opposition to Plaintiffs' Motion for Summary Judgment (ECF 47).

A. <u>Introduction</u>.

This case involves a rule promulgated by the National Park Service ("NPS") in 2020 ("2020 NPS Rule," 85 Fed. Reg. 35,181 (June 9, 2020)) that withdrew a prior rule. In the prior rule ("2015 NPS Rule," 80 Fed. Reg. 64,325 (Oct. 23, 2015)), NPS preempted certain State of Alaska hunting regulations from applying on National Preserves. In the 2020 NPS Rule, acting with significant new policy-making direction from the Department of the Interior and input from the State of Alaska, NPS withdrew some of those preemptions. As the agency tasked with administering National Preserves, NPS is well within its prerogative to reconsider and amend a prior action. Such agency actions receive deference and Plaintiffs fail to meet their heavy burden to establish that NPS acted contrary to law or arbitrarily and capriciously in adopting the 2020 NPS Rule. Accordingly, Intervenors respectfully request that this Court deny Plaintiffs' summary judgment motion.

This is a preemption case because State law governs hunting on Alaska National Preserves unless displaced by Federal law. On National Preserves, "the taking of fish and

wildlife … shall be allowed … under applicable State and Federal law and regulation." 16 U.S.C. § 3201; *see also Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1165 (9th Cir. 2022) (holding that State law governs the taking of wildlife on Federal lands in Alaska unless superseded by Federal authority).

But unlike many preemption cases that come before the Court, the question here is whether NPS committed reversible error by deciding in 2020 ***not to preempt*** various State hunting rules that NPS had previously preempted. Because NPS repealed its prior preemptive regulations in the 2020 NPS Rule, there is no "Federal … regulation" in play. Under § 3201, the issue becomes whether any other "Federal law" requires preemption, otherwise NPS was free to decline to preempt applicable State laws. Under the "plain statement rule," Congress' intent to preempt State regulation of wildlife on Federal lands within its borders must be expressed in a "clear and manifest" way, because the regulation of wildlife traditionally falls within a State's broad powers. *Wyoming v. United States*, 279 F.3d 1214, 1231 (10th Cir. 2002) (citing 43 C.F.R. §§ 24.1 and 24.3); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). As discussed below, no Federal statute or other Federal law requires preemption. Thus, NPS properly declined to preempt State law.

Here, as there are no preemptive Federal regulations, the case boils down to whether there is any Federal statutory law that is so clearly preemptive of the State's wildlife regulations and management that the Court must compel NPS to preempt. As discussed below, Plaintiffs cite no Federal statute that satisfies the "plain statement rule"

to compel NPS to preempt.  Whether NPS can lawfully toggle back to preempting state hunting rules if it chooses to do so in its upcoming rulemaking, after considering public comments from all sides, is a different issue ***not presented*** in this case.[1]  Similarly, NPS' decision to request remand while reconsidering aspects of its decision making rather than file a summary judgment brief does not change the preemption analysis.  The 2020 NPS Rule remains the law.  Plaintiffs bear the burden of proof in seeking to overturn it, and they have failed to carry that burden.[2]

    B. <u>Standard of Review</u>.

Courts review decisions of Federal agencies such as NPS under Section 706 of the Administrative Procedure Act.  *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732–33 (9th Cir. 2017).  The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law."  5 U.S.C. § 706(2).  Applying this standard, an agency's decision will only be overturned if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

---

[1] Thus, this case fundamentally differs from *Safari Club*, 31 F.4th at 1165, and *Wyoming*, 279 F.3d at 1232, where the "plain statement rule" was held to apply, but the Federal agency had taken regulatory action to preempt State wildlife regulations on Federal land.

[2] Additionally, as is discussed further in Section I, Public Law 115-20 adopted under the Congressional Review Act may prohibit the reinstatement of prior preemptive rules.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

3

runs counter to the evidence, or is so implausible that the decision could not be ascribed to a difference in view or the product of agency expertise. *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (internal quotation and citations omitted). The Court's review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

An agency must provide a reasoned basis for its decision, but an agency may also change its position on an issue if it provides a reasoned explanation. *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 968-69 (9th Cir. 2015).

Allegations of violations of the Alaska National Interest Lands Conservation Act ("ANILCA") are reviewed under the standards of the APA, as set forth in § 706. *Ninilchik Traditional Council v. United States,* 227 F.3d 1186, 1193 (9th Cir. 2000).

C. Factual Background.

In 2015 and 2016, agencies of the U.S. Department of the Interior ("DOI") adopted the 2015 NPS Rule and two other rules regarding the management of wildlife and wildlife-dependent recreational activities on Federal lands in Alaska.[3] These rules preempted State wildlife management actions based on the agencies' characterization of Alaska Board of Game ("BOG") decisions as "predator control." In the 2015 NPS Rule,

---

[3] The other two rules were a U.S. Fish and Wildlife Service ("FWS") rule restricting many of the same hunting methods and means at issue here on National Wildlife Refuges in Alaska (the "2016 Refuges Rule"), 81 Fed. Reg. 52,248 (Aug. 5, 2016), and an FWS rule restricting the harvest of bear over bait and predator hunting on the Kenai National Wildlife Refuge (the "Kenai Refuge Rule"), 81 Fed. Reg. 27030 (May 5, 2016).

NPS took the position that the BOG's allowance of "liberalized methods of hunting and trapping" conflicted with NPS land management mandates to justify the preemption of State law.  *E.g.*, 2015_NPS0000002.

The State and organizations like APHA and SCI opposed the 2015 NPS Rule and explained why the State management actions were not "predator control," as NPS claimed.  *E.g.*, 2015_NPS002815 (APHA comments); 2015_NPS0040972 (State of Alaska, CAFCA comments).  Despite these objections, NPS finalized the 2015 NPS Rule.  2015_NPS0000002.  But NPS reconsidered that decision based on changes in DOI priorities and its consideration of State harvest data, determining it was more appropriate ***not*** to preempt the State's actions and adopting the 2020 NPS Rule.  2020_NPS0000623; 2020_NPS0009146 (State of Alaska comments).  NPS supported its decision based on an Environmental Assessment prepared under the National Environmental Policy Act ("NEPA") and revised with information received during the public comment period. 2020 NPS0000633 ("2020 Rule EA").

> D. In the absence of conflicting "Federal law" or regulation, Alaska law controls; 16 U.S.C. § 3201 specifically confirms this is true for National Preserves in Alaska.

Alaska has the authority to manage and protect wildlife within its borders, including on Federal lands, unless expressly preempted by Congress in a statute or by a Federal agency exercising regulatory authority consistent with a clear Congressional delegation of the authority to preempt.  *Hughes v. Oklahoma*, 441 U.S. 322 (1979); *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976); *Geer v. Connecticut*, 161 U.S. 519,

528 (1896), *overruled on other grounds by Hughes*, 441 U.S. at 325; *see also* 43 C.F.R. 24.3(a). A large part of the drive for Alaska to become a State was its people's desire to self-manage its resources, including fish and wildlife. *See, e.g.*, *Pullen v. Ulmer*, 923 P.2d 54, 57 n.5 (Alaska 1996); *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 47 (1962). The Alaska Statehood Act transferred ownership of natural resources within Alaska to the State.[4] Pub. L. No. 85-508, 72 Stat. 339 (1958). Beginning in 1960, after adoption of its own comprehensive fish and game code, Alaska took control of fish and wildlife management from the Federal government. *See* Executive Order No. 10857, 25 Fed. Reg. 33 (Dec 29, 1959) (transferring management of fish and wildlife resources to the State of Alaska effective January 1, 1960); *see also Metlakatla Indian Cmty.*, 369 U.S. at 47, n.2.

Alaska's interest and desire for management of its fish and wildlife resources is reflected in the Alaska Constitution, which requires those resources to be managed for the maximum benefit of the people. Alaska Const. art. VIII, § 2. The Alaska Constitution further requires that management of fish and wildlife resources be for the common use of the people and consistent with the "sustained yield" principle. *Id.* art. VIII, § 4; *see also*

---

[4] The recent decision in *Safari Club* recognizes a narrow exception for lands that, as of the Statehood Act, had been withdrawn from the general Federal domain to serve as "refuges or reservations for the protection of wildlife." *See Safari Club*, 31 F.4th at 1168; *see* Pub. L. 85-508 § 6(e) (distinguishing between different categories of lands with wildlife protection purposes). This decision is subject to further review. To the extent that decision is correct, the exception it recognizes applies to only a portion of the Federal public lands governed by ANILCA and is immaterial to this case because NPS was in no way obligated to preempt state law.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

6

*West v. Bd. of Game*, 248 P.3d 689, 695 (Alaska 2010) ("The sustained yield principle applies to all wildlife ... including wolves and bears."). The Alaska Constitution grants the Alaska Legislature the primary power to manage fish and wildlife resources, which the Legislature has done through a variety of statutes. Alaska Const. art. VIII, § 2; *see generally* AS 16.05.010; AS 16.05.950. In the Alaska Statehood Act, Congress accepted and ratified the Alaska Constitution. Public Law 85-508 §1.

The Alaska Legislature created Alaska's Board of Game and authorized and obligated the BOG to "provide for the conservation and development" of Alaska's wildlife resources. AS 16.05.221(b). The BOG regulates "the conservation, development, or utilization of game in a manner that addresses whether, how, when, and where the public asset of game is allocated or appropriated." AS 16.05.255. This includes establishing seasons, means and methods of take, and bag and harvest limits for hunting; implementing "methods, means, and harvest levels necessary to control predation and competition among game in the [S]tate"; and "regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game." *Id.*

The Alaska Department of Fish and Game ("ADF&G"), led by its Commissioner, administers regulations adopted by the BOG in accordance with the statutory duty to "promote fishing, hunting, and trapping and preserve the heritage of fishing, hunting, and trapping in the state." AS 16.05.050(a)(19).

While the Property Clause of the U.S. Constitution grants Congress authority over Federal land, including authority over wildlife on Federal land, that authority is only vested in Federal agencies like NPS if Congress expressly delegates such authority to them. *See Kleppe*, 426 U.S. at 542-43; *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority."). "States have broad trustee and police powers over wild animals within their jurisdictions." *Kleppe*, 426 U.S. at 545. While Congress granted NPS some power to regulate wildlife within National Preserves under 16 U.S.C. § 3201, "Alaska is different." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1072 (2019) (internal quotations omitted); *see also Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2438 (2021) ("The 'simple truth' reflected in those prior cases is that 'Alaska is often the exception, not the rule.'") (quoting *Sturgeon v. Frost*, 577 U.S. 424, 440 (2016)).

For National Preserves in Alaska, Congress granted the Department of the Interior ("DOI") the authority to "designate zones where and periods when no hunting, fishing, trapping, or entry may be permitted for reasons of public safety, administration, floral, or faunal protection, or public use and enjoyment." § 3201. This power to open and close hunting in zones and periods for specified reasons does not refer to methods and means of hunting, and so is not a clear authorization to NPS or DOI to regulate the methods and means of hunting on National Preserves in Alaska. More pertinent to this case, § 3201 is most certainly not a mandate that NPS regulate methods and means of hunting, which is

the point of this case. Thus, Alaska retains the authority to manage the methods and

means of hunting on these public lands.[5] For this reason, NPS' deference to State

hunting regulations was lawful.

     E.  <u>Plaintiffs fail to identify Federal statutes compelling NPS to preempt.</u>

     Plaintiffs' brief repeatedly argues that Federal law prohibits "predator reduction

efforts," citing to a range of statutory provisions in ANILCA and the National Park

Service Organic Act ("Organic Act"). ECF 47 at 18-21. But these arguments ring

hollow, because no Federal law actually makes that statement—or even comes close to

it. The statutory provisions that Plaintiffs cite from ANILCA and the Organic Act are

general in nature; the provisions require the conservation of species and habitat, but not

in the specific way Plaintiffs advocate. Pointedly, none of Plaintiffs' statutory cites

address the specific State hunting rules at issue here.[6]

---

[5] *See* 16 U.S.C. § 3202(a); Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959); Pub. L. 85-508 6(e), 72 Stat. 341.

[6] The challenged provisions include, but are not limited to: (1) an extended hunting season for wolves and coyotes in certain Game Management Units ("GMUs"), with respect to the portion of that hunt occurring on National Preserves; (2) the use of bait in hunting black bear in certain GMUs containing Alaska's remote National Preserves, at least one mile from any inhabited place; and (3) any present or future State hunting rule, to the extent applicable to National Preserves, adopted with the intent or effect of reducing predator species to increase the numbers of prey species more suitable for use by humans as food. *See* former 36 C.F.R. §§ 13.42(f) and (g) (2015). Intervenors do not concede that any of these practices are "predator reduction efforts," and predator reduction is governed by a separate legal regime in Alaska ("intensive management" prescribed under AS 16.05.255), apart from the general "sport" hunting regulations. The summer hunting of wolves and coyotes is an increased harvest opportunity under those general regulations.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

9

For example, Plaintiffs cite the very first provision of the Organic Act, which provides that NPS must "conserve the scenery, natural and historic objects, and wildlife" in the National Park system. 54 U.S.C. § a(a) (cited in ECF 47 at 3). Similarly, they cite a clause stating ANILCA's purposes, which include to "preserve unrivaled scenic and geologic values associated with natural landscapes, to provide for the maintenance of sound populations of, and habitat for, wildlife species …, to preserve wilderness values and related recreational opportunities included but not limited to … sport hunting … [,] and to maintain … undisturbed ecosystems." 16 U.S.C. § 3101(b) (cited in ECF 47 at 2). These general directives do not compel NPS to preempt State hunting rules.[7] Nor do the sections within ANILCA that set forth the purposes for the establishment or expansion of individual parks and preserves require NPS to manage these lands by maintaining particular natural animal population levels and undisturbed ecosystems as

---

[7] As additional examples, Plaintiffs cite:

An ANILCA general administration provision that clarifies that ANILCA does not derogate from either NPS' authority to manage the land or the State of Alaska's authority to manage the wildlife inhabiting the land. *See* ECF 47 at 3, n.11-13 (citing 16 U.S.C. §3202).

ANILCA provisions that establish a priority for subsistence hunting over sport hunting in certain circumstances. *Id.* at 21-26 (citing 16 U.S.C. §§ 3112, 3114, and 3118). None of these provisions compel preemption and Plaintiffs' Complaint raises no subsistence hunting claims.

Plaintiffs contend.  (ECF 47 at 3.)[8]  These provisions direct NPS to "protect" the "habitat" and "populations" of bears, wolves, ***and other species*** (which Plaintiffs ignore in their brief).  16 U.S.C. §§ 410hh, 410hh-1, and 410hh-2 (cited in ECF 47 at 3 & nn.9-10).  Because related ANILCA provisions also direct NPS to allow sport hunting on National Preserves, these unit-establishing provisions mean that "populations," rather than individual bears and wolves, are to be protected.  16 U.S.C. § 410hh-2 (… "Provided, however, that hunting shall be permitted ….").

The one ANILCA provision that comes closest to speaking to the contentions regarding "natural" animal population levels raised by Plaintiffs is in the subsistence title, and that provision weighs against Plaintiffs' contentions.  16 U.S.C. § 3125(3) declares that nothing in the subsistence title authorizes NPS to restrict ***non-subsistence*** hunting on less-regulated Federal land units such as National Preserves unless animal "populations" fall below the "healthy" level, or certain other situations not involving

---

[8]  16 U.S.C. § 410hh in a series of subsections sets forth the purposes for individual National Preserves established or expanded under ANILCA, sometimes in conjunction with associated Parks and Monuments.  The language used for each Preserve varies. Plaintiffs cite subsections (1), (8), and (10) but not subsections (2), (4), (7), or (9).  ECF 47 at 3, n.10.  However, none of the subsections mandates that NPS restrict certain types of hunting to maintain populations at particular "natural" levels.  These provisions instruct NPS and the State to act to protect wildlife populations on Preserves, sometimes using "natural" language in relation to wildlife, sometime not, and the next section allows subsistence and sport hunting on those units.  *Id.* § 410hh-2.  Hunting of course has been a natural part of the landscape for thousands of years.  The provisions do not require that hunting be conducted in such a way that populations are completely unaltered by the hunting.  16 U.S.C. § 3125, reviewed below, much more specifically addresses issues concerning animal population levels and hunting, through drawing a distinction between a "natural and healthy" animal population standard applicable to more-regulated Parks and Monuments and a "healthy" standard applicable to Preserves.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

11

animal population levels occur.  In contrast, § 3125(1) declares that nothing in the subsistence title prevents NPS from restricting subsistence hunting on more regulated National Parks and Monuments if animal "populations" fall below a "natural and healthy" level, or from restricting subsistence hunting on other units including National Preserves if animal "populations" fall below a "healthy" level.  Intervenors recognize that § 3125 speaks directly only to the subsistence title.  However, the contrast between the "healthy" animal "populations" standard applicable to National Preserves and the "natural and healthy" standard applicable to National Parks and Monuments weighs in NPS' favor in this case concerning National Preserves.  Congress intentionally allowed for NPS and the State to manage hunting in National Preserves through less restrictive means than the "natural and healthy" requirements for National Parks and Monuments. No other provisions outside the subsistence title deal with this specific issue.  In short, no provision in any title of ANILCA compels that NPS manage animals on less-regulated National Preserves to the "natural" animal population standard that Plaintiffs demand.[9]

Moreover, the Organic Act authorizes NPS to engage in "the destruction of such animals and plant life as may be detrimental to the use of any System unit," which in turn authorizes aggressive predator control management strategies that surely

---

[9] In any event, as discussed in Points F and G below, NPS reasonably found as a factual matter that the challenged state hunting regulations were not having population level impacts on species, and so were not creating a non-natural environment on national preserves as Plaintiffs allege.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

12

contemplate "non-natural" management.  54 U.S.C. § 100752.  The century-old NPS Organic Act largely pre-dates the "natural management" concepts that Plaintiffs advocate.

Additionally, Plaintiffs fail to cite, let alone grapple with, the most relevant legal authority: the rules DOI adopted in the 1980s to govern the application of State hunting laws on DOI land units, including NPS units.  43 C.F.R. §§ 24.1–24.7.  These regulations reaffirm Intervenors' point that no Federal law applies to preempt the specific hunting regulations at issue.  NPS quoted those DOI rules in the 2020 NPS Rule: "Federal authority [over hunting on Federal lands] exists for specified purposes while State authority regarding fish and resident wildlife remains the comprehensive ***backdrop*** applicable ***in the absence of specific***, ***overriding Federal law***."  43 C.F.R. § 24.1(a) (quoted at 2020-NPS0000623, emphasis added).  As discussed above, there is no "specific overriding Federal law" preempting these state hunting rules.  DOI's rules further explain that "in general the States possess broad trustee and police powers over fish and wildlife within their borders, including fish and wildlife found on Federal lands within a State," subject to "preempt[ion]" only under the Constitution's Property, Commerce, and treaty clauses.  43 C.F.R. § 24.3(a).  Most importantly, DOI confirmed that "***Congress has***, in fact, ***generally declined*** to diminish the responsibility and authority of the States to manage fish and resident wildlife on Federal lands." *Departmental Fish and Wildlife Policy; State-Federal Relationships*, 47 Fed. Reg. 46,147, 46,148 (Oct. 15, 1982) (emphasis added), *adopted*, 48 Fed. Reg. 11,642 (Mar. 16,

1983).  In sum, under these DOI regulations, State hunting regulations prevail on Federal lands in the absence of specific overriding law.

It is also noteworthy that the State rules that Plaintiffs challenge fall outside the scope of the specific preemption clause included in ANILCA, 16 U.S.C. § 3201, the statute mandating that NPS allow sport as well as subsistence hunting on National Preserves.  Section 3201 provides that "consistent with the provisions of section 816[, NPS] may designate **_zones_** where and **_periods when_** no hunting, fishing, trapping, or entry may be permitted for reasons of public safety, administration, floral and faunal protection, and public use and enjoyment."  § 3201 (emphasis added).  The preemption that NPS ordered in the 2015 NPS Rule and then repealed in the 2020 NPS Rule did not pertain to "zones and periods where no hunting … may be permitted."  Rather the preemption concerned specific methods and means of hunting and specific species.[10]  *See* former 36 C.F.R. § 13.42(f) (2015) (use of bait to hunt bear, hunting of wolves and coyotes between May 1 and August 9, hunting swimming caribou, etc.).

F.   Legislative history and policy manuals do not compel preemption.

Faced with this regulatory "backdrop" in the DOI rules, and the generality of the statutory provisions of the Organic Act and ANILCA, Plaintiffs' reasons for compelling preemption rely heavily on the conflicting legislative history and an NPS policy manual

---

[10] In contrast to the lack of any specific ANILCA provisions discussing methods and means of hunting and authorizing DOI to regulate them, an ANILCA provision authorizes DOI to exercise a limited degree of regulatory authority over the specifics of temporary hunting facilities such as tent platforms and blinds.  *See* 16 U.S.C. § 3204.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

14

that declares itself to be unenforceable. Hunting does not violate the Organic Act. As NPS argued in *Fund for Animals v. Mainella*, 294 F. Supp. 2d 46 (D.D.C. 2003), where Congress specifically mandates hunting, hunting cannot be considered a violation of the Organic Act. NPS is not required to restrict hunting and may rely on the State's management. *Id.*

Plaintiffs cite ANILCA's legislative history for the proposition that NPS must manage wildlife "without the changes that extensive human activities would cause," and assert that "it is contrary to the National Park System concept to manipulate habitat or populations to achieve maximum utilization of natural resources." ECF 47 at 3-4, 20-21, 42 (quoting ANILCA S. Rep. 96-413 at 137 and 171, also citing ANILCA H. Rep. 96-97 and statements of individual Members of Congress in the Congressional Record). Citing to the Senate Report rather than ANILCA's text, Plaintiffs further state: "Congress directed [NPS] not 'to engage in habitat manipulation or control of other species' to support consumptive uses." ECF 47 at 21. But Plaintiffs' reliance on this legislative history is unavailing, because the legislative history is conflicting and the statutory text does not support Plaintiffs as discussed above. As explained in the Senate Report on which Plaintiffs rely, the "nature and degree" of "manipulations of the components of the ecosystems" that are permissible is a matter left to the agencies under their various policies. *Id.* at 3, n.12 (quoting S. Rep. 96-413 at 233). Further, Plaintiffs' claim that the State is manipulating populations and habitat runs counter to the facts. NPS in the 2020 NPS Rule and its Environmental Assessment ("EA") found that the number of animals

that would be harvested under the challenged State rules was too low to have a population-level impact, and therefore too low to manipulate habitat or species.[11]

Moreover, even if the factual predicate to Plaintiffs' manipulation claim was true (it is not), a party may resort to using legislative history to clarify the meaning of a statute only if the statutory text is ambiguous. *See Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1164 & n.11 (9th Cir. 2019) (holding that the use of legislative history is proper only if a statute is ambiguous). Plaintiffs do not claim that relevant provisions of either ANILCA or the Organic Act are ambiguous and they do not identify any statutory text that can fairly be read as mandating preemption of these State hunting rules, which requires resort to legislative history to resolve ambiguities and confirm preemption.[12] In fact, ANILCA and the Organic Act are completely silent on the State hunting rules at issue in this case. The law cannot be established through citation to legislative history when the statute does not address a topic. Such a situation does not involve an ambiguous statute but rather, one that does not cover the subject. Thus, the silence of ANILCA and the Organic Act on subjects such as the extended season for hunting of wolves and coyotes and the use of bait to hunt black bears is not an "ambiguity" that

---

[11] *See* 2020_NPS0000696-97 (revised EA for 2020 rule); 2020_NPS0000678 (related Finding of No Significant Impact "FONSI"); 2020_NPS0000625, 626, 630 (2020 NPS Rule). This finding is consistent with Alaska law which provides that allowing an individual hunter to take a predator is not predator control. Predator control is only allowed by ADF&G or its contractors as part of an intensive management program authorized by the BOG. AS 16.05.255(e)-(g) and (k).

[12] See Section E above, reviewing the statutes that Plaintiffs cite.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

16

legislative history can resolve. *E.g.*, *Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 683 (9th Cir. 2006) (finding that, "[i]n this instance, the statute is not ambiguous. Instead it is entirely silent on the burden of proof on removal," and declining to use discussion in Senate Report to establish law); *see also Steinle*, 919 F.3d at 1164 (similar); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007) (similar).[13] Plaintiffs' reliance on legislative history cannot compel NPS to preempt these State rules.

Along with inapplicable legislative history, Plaintiffs' argument also heavily relies on another source of authority that is not law, and so cannot preempt, and which Plaintiffs once again misread: the NPS Management Policies 2006. Plaintiffs read these policies as mandating that National Preserves be managed for "natural processes" that do not involve hunting of predators at "non-natural" levels. *See* ECF 47 at 2, 19-20, 27-28. As a preliminary matter, NPS in the 2020 NPS Rule rejected Plaintiffs' claim under the policy manual, finding that the 2020 NPS Rule's level of impact on species was low and did not reach the level of being "non-natural" manipulation. 2020_NPS0000628 (citing data that impact of these state hunting rules on population levels was likely to be "negligible"). As such, even if the NPS Management Policies 2006 applied to this suit, NPS acted consistently with those policies in issuing the 2020 NPS Rule.

---

[13] Committee reports "may in some cases be written by an individual legislator, congressional staffers, or even lobbyists. Giving binding effect to passages in legislative reports may thus give binding effect to the unchecked will of a lone person, and that is not what our Constitution envisions." *Nw. Envtl. Def. Ctr.*, 477 F.3d at 684-85.

Moreover, Plaintiffs' claim fails at the threshold because policy manuals, such as the NPS Management Policies 2006, are not intended by the agency to create enforceable law and so do not and cannot preempt State law. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 966 (9th Cir. 2015) ("We therefore join the Third Circuit in declining to afford preemptive effect to agency actions that do not carry the force of law…"). The Ninth Circuit has specifically held that NPS management policies is a non-binding agency document because it "does not evidence an intent on the part of the agency to limit its discretion and create enforceable rights," and NPS in adopting the manual "did not intend to announce substantive rules enforceable by third parties in federal court." *River Runners for Wilderness v. Martin,* 593 F.3d 1064, 1071-72 (9th Cir. 2010).[14] Finally, the manual expressly states that it does not create enforceable rights:

> The policies contained within this document are intended only to improve the internal management of the National Park Service; they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

NPS Management Policies 2006, p. 4.[15] The Ninth Circuit took this waiver of enforceability at its word, and held that a litigant may rely on the policy manual only for

---

[14] *River Runners* construed the 2001 version of NPS Management Policies, but the Ninth Circuit's ruling is equally applicable to the 2006 version because the 2006 version contains similar disclaimers of enforceability. *See W. Watersheds Project v. Salazar*, 766 F. Supp. 2d 1095, 1114 (D. Mont. 2011).

[15] https://www.nps.gov/subjects/policy/upload/MP_2006.pdf at p. 4 ("Compliance, Accountability and Enforceability").

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

18

the limited purpose of a NEPA claim against a land management policy, where the Environmental Impact Statement at issue relied on the policy manual explicitly to support its decision. *River Runners*, 593 F.3d at 1072-74. Where, as here, the agency reviewed its policy manual outside of the NEPA, this limited exception does not apply, and it would not in any event support a challenge to a regulation, which is higher authority.[16] Indeed, NPS Management Policies 2006 declares itself subordinate to "higher authorities" including "regulation," such as the 2020 NPS Rule and 43 C.F.R. Part 24.[17]

In addition, the NPS policy manual declares itself subordinate to Secretarial Orders such as the 2017 and 2018 policy decisions by the Secretary of the Interior (cited by NPS in the 2020 Rule). These Secretarial Orders direct DOI agencies, including NPS, to better align their regulations with State hunting rules by working to eliminate Federal rules that are more restrictive than State hunting rules.[18]

----

[16] Plaintiffs concede the "Management Policies are not directly enforceable," but assert they are indirectly enforceable. *See* ECF 47 at 20, n.93. Plaintiffs' argument makes no sense, because a rule such as the 2020 NPS Rule is law and is higher authority than a manual or management plan. Allowing judicial review of a rule on the grounds of alleged inconsistency with a manual would be contrary to the manual's enforceability disclaimer.

[17] NPS Management Policies 2006, p. 4 ("Hierarchy of Authorities," URL provided above in n.15).

[18] NPS Management Policies 2006, p. 4 (declaring itself subordinate to "directives of the Secretary of the Interior"). The 2020 NPS Rule (2020_NPS0000623) discusses the Secretary of the Interior's Memorandum to the Heads of Bureaus and Offices (Sept. 10, 2018, 2020_NPS0010205-06); Secretarial Order 3347 §§ 1, 2 (Mar. 2, 2017, 2020_NPS0008709) and Secretarial Order 3356 §§ 4.b(4) and 4.d.(7) (Sept. 15, 2017, 2020_NPS0008714-16) as well as the DOI rules at 43 C.F.R. Part 24. The 2020 NPS Rule goes on to analyze NPS Management Polices 2006. 2020_NPS00000628.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

19

Even if NPS Management Policies 2006 were enforceable, the policy manual did not compel NPS to preempt here. The manual allows "harvest" management efforts needed to maintain populations at "self-sustaining" levels, which significantly qualifies any perceived mandate to manage populations in a "natural" manner. NPS Management Policies 2006, § 4.4.3. Furthermore, right after saying that NPS does not allow "predator control," the policy explains that NPS "manages harvest to allow for self-sustaining populations of harvested species and does not engage in the stocking of plants or animals to increase harvest." *Id.* Thus, the NPS policy (were it legally binding) would prohibit intensive management, which includes "predator control," but it does not prohibit (or require NPS to prohibit) some level of management response to predation pressure that is driving prey species below "self-sustaining" levels. NPS later acknowledged error in its 2015 conclusion that the NPS Management Policies 2006 require preemption for natural processes. *See* 83 Fed. Reg. 23,621, at 23622 (finding the 2015 NPS Rule's conclusion that strictly natural wildlife management is required "goes beyond the plain language of section 4.4.3 of the Management Policies."). The State regulations on hunting methods and means are neither for the purpose of predator control nor stocking. The State continues to manage all wildlife, predator and prey, on the sustained yield principle as required by the Alaska Constitution.

G.  NPS acted reasonably and within the APA's bounds in declining to preempt.

The 2020 NPS Rule is reasonable and well-supported in the administrative record, satisfying the APA's "arbitrary and capricious" test. Plaintiffs' contrary arguments,

which fail to discuss most of the specifically preempted hunting practices, are not persuasive. Plaintiffs' burden on summary judgment is to demonstrate that NPS made a "clear error of judgment"[19] in declining to preempt state hunting regulations that were adopted following a public process and in the ordinary course. Plaintiffs do not, and cannot, meet this burden. Accordingly, Plaintiffs' motion for summary judgment should be denied and their APA claims dismissed.

1. *Preemption of State hunting regulations are not related to a "predator reduction effort."*

Plaintiffs' characterization of the State hunting rules as "predator reduction efforts" is not factually supported. Plaintiffs assert that NPS could not rely on DOI "policy guidance" in adopting the 2020 NPS Rule, and even if it could, those policies require compliance with Federal law. ECF 47 at 32-33. That argument merely rehashes Plaintiffs' overall complaint that the 2020 NPS Rule does not comply with NPS' statutory mandates—while ignoring the evidence and reasoned analysis on which NPS relied in choosing to no longer preempt the State regulations. NPS explained that removing the general preemption of so-called State "predator reduction efforts" ended up treating Alaska the same as lower 48 States, and acknowledged that "25 national park units [in the lower 48 States have] … year-round coyote seasons, six of which allow the use of artificial light, seven units which allow hunting black bears with dogs, and four

---

[19] *E.g.*, *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

which allow the harvest of black bears over bait." 2020_NPS0000626.[20] Far from being *in*consistent with Federal law and policy, the 2020 NPS Rule rendered NPS' treatment of Alaska more consistent. Further, the 2020 NPS Rule explains that in ANILCA, Congress authorized some degree of State actions to responsibly manage wildlife populations on National Preserves: the very fact ANILCA requires that hunting be allowed on National Preserves demonstrates Congress' intent "to authorize management for something less than populations untouched by human influence." 2020_NPS0000628.

Plaintiffs also assert that NPS failed to adequately explain why deleting the preemption of "predator reduction efforts" would provide "regulatory certainty," arguing that the "2015 [NPS] Rule did not leave the public guessing about what practices were allowed on Preserves." ECF 47 at 33. But Plaintiffs are wrong that the public was not left guessing. The 2020 NPS Rule describes how removing this preemption will "complement regulations on lands and water within and surrounding national preserves," which would include State lands and the National Wildlife Refuges on which State management was restored through Public Law 115-20 as discussed in point I below, and will also "help provide regulatory certainty to park users about what hunting practices are or are not allowed in national preserves." 2020_NPS0000630. NPS was justified in believing the removal of this preemption would achieve these goals because park users

---

[20] In addition to the four NPS units in the Lower 48 where use of bait to hunt black bear is allowed, that practice is further permitted on a variety of other Federal and State public lands in the Lower 48. *See e.g.* Michigan Black Bear Digest, P. 22, available at https://www.michigan.gov/dnr/things-to-do/hunting/bear.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

22

themselves requested this change, for this very reason.  2020_NPS0000626-27

(discussing comments from user groups which identified "unnecessary confusion for

rural residents" with respect to hunting across different land categories as a reason to

remove the preemption, and objected to "the complexity of regulating harvest in Alaska,

which council members agreed would be simplified by 'having Federal, State, and Park

Service regulations match each other as much as possible'").  The 2020 NPS Rule

returned general hunting to State management, as it had been for many years after

Statehood.

Last, Plaintiffs gloss over the 2020 NPS Rule's reliance on similarities in the

NEPA analysis conducted in support of each rule.  As the 2020 NPS Rule pointed out, the

2015 NPS Rule's preemptive language was unnecessary to protect wildlife resources on

National Preserves, because "the overall conclusion in the Finding of No Significant

Impact ("FONSI") for the EA supporting the current rule—a determination that the

proposed action will not result in significant adverse impacts—is consistent with NPS

statements made in the Finding of No Significant Impact for the 2015 NPS Rule, which

noted how neither of its alternatives was 'likely to have a significant effect on park

resources.'"[21]  2020_NPS0000630.  In sum, NPS' reasons for deleting the general preemption of certain hunting methods referred to by Plaintiffs as "predator reduction efforts" was well-reasoned and supported.

2. *Hunting bears over bait is an accepted practice.*

Plaintiffs' challenges to the 2020 NPS Rule for permitting the harvest of bears over bait also fail to show that NPS acted arbitrarily or capriciously.  These are not the first set of plaintiffs to contend to a Federal court that the use of bait conditions bears to human food and sets off a chain of events leading to bears attacking humans.  Courts have rejected these claims in the past.  Addressing the same alleged public safety argument in adopting a nation-wide rule deferring to state hunting laws on the use of bait to hunt black bear on National Forests, the U.S. Forest Service concluded that "[t]here is no evidence that baiting increases human-wildlife conflicts. … Bears do not become conditioned to bait.  Bear baits are temporary features.  Once the bait is removed, bears revert to natural foods."  *Use of Bait in Hunting*, 60 Fed. Reg. 14,720, 14722 (Mar. 20, 1995).  Environmental groups sued the Forest Service, contending that hunting bear over

_____

[21] Plaintiffs also criticize NPS for accepting the State's representations that its hunting regulations were not "predator reduction efforts."  ECF 47 at 34.  But Plaintiffs do not explain why NPS cannot take the State's word for the purpose of its hunting regulations. As discussed above, the State is the designated wildlife manager and NPS must defer to the State's regulations except in limited circumstances.  Moreover, NPS essentially misunderstood the State's hunting management in the 2015 NPS Rule.  Since publication of that rule, NPS and the State have engaged in more fulsome consultation (as required by ANILCA), and NPS reached the opposite conclusion that the State's adoption of these limited-purpose regulations was not part of any predator control or predator reduction efforts.  *E.g.*, 2020_NPS0000733; 2015_NPS0004372-90.

bait was "dangerous to non-hunters in the vicinity" and that the authorization of bait was inconsistent with the Forest Service's statutory duty to keep forests in a "natural condition." *Fund for Animals v. Thomas*, 932 F. Supp. 368, 369 (D.D.C. 1996). The District Court rejected those arguments and upheld the Forest Service's deference to the states, *id*. at 271, and the D.C. Circuit affirmed, 127 F.3d 80 (D.C. Cir. 1997). Plaintiffs here should fare no better.

NPS' deference to State regulations authorizing the use of bait is reasonable.[22] Plaintiffs point to nothing in the record indicating that people "have been mauled" as a result of harvest of bears over bait. Bait stations have not been shown to lead to an increase in human-bear conflicts, particularly given the remoteness of the Alaska NPS units involved in this case. And while Plaintiffs are correct that NPS acknowledged that the use of bait can impact bear behavior (i.e., by attracting bears), NPS addressed this concern in several different ways. First, NPS explained that "bear baiting differs [from activities such as intentional feeding or garbage attractants] in that bears do not necessarily associate baits with humans, and thus may not become food conditioned or habituated." 2020_NPS0000628. Second, NPS relied on an analysis of black bear baiting on Alaska National Preserves and State records, both of which reinforced the conclusion that the use of bait has not empirically led to an increase in human-bear

---

[22] It is also consistent with NPS' deference to State regulations in most other Park units that permit the hunting of bears and include harvest over bait as a lawful means of take. *E.g.*, 2015_NPS0119312.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

25

incidents. *Id.*; 2020_NPS0000698 ("The State points to areas with relatively high levels of bear baiting … that have comparatively fewer nuisance bear issues than other urban areas…"). As NPS discussed, the study of black bear baiting on preserves concludes that "there are no recorded incidents of attacks or injures related to baiting" to members of the public. As NPS reasoned:

> Bear baiting in national preserves [in Alaska] would occur in the midst of nearly 20 million acres of very sparsely populated and remote areas, with few visitor facilities or services on site, if any. Human-bear interactions from bear baiting are likely to be rare -except for the hunters seeking bears—both due to the lack of observed bear conditioning to associate bait stations with humans and the relatively few people in such remote areas to interact with bears. The State registers thousands of black bear state stations yearly, and has done so for many years, but to date, it and other states which allow this practice have not detected problems that can be directly attributed to bear baiting.

2020_NPS0000628. NPS also relies on state bait regulations "to mitigate risks to public safety, as they include requirements for site registration, signage, site cleanup and remove, and minimum distances from maintained roads, trails, houses, businesses and developed recreational facilities." 2020_NPS0000629. This is reasoned decision-making based on the "specialized [F]ederal agency's presumptive expertise in the

subject," *Safari Club*, 31 F.4th at 1174, and this Court should reject Plaintiffs' unsupported objections.[23]

      3.  *Extended State hunting seasons for wolves and coyotes are not preempted.*

Plaintiffs do not explain their objection to the deletion of the preemption of the extended hunting season for wolves. In any event, they could point to little support in the record. NPS' conclusion that the State's extended season does not reduce wolf and coyote populations (so as to constitute "predator reduction") is supported in the administrative record. The State submitted data to show the ratio of summer-hunted wolves to total-hunted wolves in the GMUs that overlap with National Preserves. 2020_NPS0000696. In other words, for the non-NPS lands near the NPS lands at issue, the State maintains data on the number of wolves and coyotes hunted in the extended season, allowing NPS to readily project how much additional hunting of wolves would likely occur through rescinding the preemption of that activity on National Preserves.

---

[23] Applying the deferential arbitrary and capricious standard of review, the Ninth Circuit recently upheld the FWS" decision to preempt a BOG regulation authorizing the harvest of brown bears at black bear bait stations on the Kenai National Wildlife Refuge, based in part on public safety concerns. *See Safari Club*, 31 F.4th at 1173. There the Court held that the FWS "need not 'support its conclusions with empirical research,'" *id,* (quoting *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010)), and deferred to the agency's decision based on the agency's "presumptive scientific expertise on how practices of feeding brown bears may relate to human safety and the likelihood that the endangered bear population can be maintained or increased." *Id.* The arbitrary and capricious standard of review recognizes that agencies have options and allows agencies to make different choices. Thus, the Court in this case should defer to NPS' decision ***not*** to preempt state regulations and its presumptive scientific expertise in reviewing different data (including data showing that very few bears are taken over bait on National Preserves, *e.g.*, 2020_NPS0000642) and reaching a different conclusion.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

*See id.*  As NPS described in the EA, on the non-NPS lands near National Preserves, only 54 of the 1,750 wolves harvested between 2012 and 2016 were harvested in the extended season (May 1 through August 31).  2020_NPS0000696.  This is just eleven wolves harvested per year during the State's extended season.  *Id.*  This data supported NPS' conclusion that allowing summer hunting of wolves and coyotes would not have "meaningful" impacts or "population-level" impacts on wolves and coyotes present on National Preserves, refuting Plaintiffs' claims regarding species and habitat manipulation, or that wolves or coyotes would be brought below "healthy levels."  *See* 2020_NPS0000696-97 (EA for 2020 Rule), 2020_NPS0000678 (FONSI), 2020_NPS0000625, 626, 630 (2020 Rule); *see also* 2015_NPS0003932 (the Federal Subsistence Board, of which NPS is a member, supported adoption of extended season for subsistence trapping of coyotes).  The EA for the 2020 NPS Rule noted the difficulty hunters have in accessing "vast remote landscapes" of Alaska National Preserves and the opportunistic nature of most wolf hunting as reasons (among others) that the additional take of wolves through the extended hunting season will be limited.  2020_NPS0000696.  In short, the State's election to extend the wolf and coyote season on certain GMUs is the quintessential State hunting law protected from preemption by the DOI rules discussed above.  43 CFR 24.1(a), 24.4(h)(3).[24]

---

[24] Hunting of coyotes on National Preserves during the extended season is expected to be even more limited than summer hunting of wolves, to the point that NPS determined to dismiss the extended coyote hunting issue from the NEPA analysis.  2020_NPS0000686 (FONSI).

4. *Taking black bear with artificial light at den sites is a traditional practice.*

A number of the hunting restrictions in the 2015 NPS Rule mirrored restrictions in Alaska's existing regulations. For example, the 2015 NPS Rule generally prohibited taking a fur animal or furbearer by disturbing or destroying a den, the same as BOG regulations. *Compare* 2015_NPS0000019, *with* 5 AAC 92.090(2) and 5 AAC 92.095(a)(1). It also prohibited the taking of bears or ungulates with a snare, net, or trap, the same as BOG regulations. *Compare* 2015_NPS0000019, *with* 5 AAC 92.085(6) and 5 AAC 92.090(1). The 2015 NPS Rule barred the taking of cub bears or female bears with cubs, taking bears with artificial light, and taking bears at den sites. 2015_NPS0000019. These are all generally prohibited practices under State law as well. 5 AAC 92.260 (cubs and sows with cubs); 5 AAC 92.080(7)(c) (artificial light); 5 AAC 92.090(2) (disturbing a den). When the 2020 Rule withdrew Federal preemption of State-authorized hunting, in many cases, the rule made no practical change because the State restrictions prohibiting the same hunting methods and means remained in place.

The BOG made limited exceptions where the harvest of bears in dens, with artificial light, is permitted in some interior GMUs. Opposition to the BOG's authorization ignores the fact the BOG sought to accommodate customary and traditional subsistence activities practiced by certain Alaska Native communities—not "predator control" or even activities in which traditionally-defined "sport" hunters engage. 5 AAC 92.260; 2020_NPS0009218. The 2015 NPS Rule's preemption of this limited authorization is grounded in a disconnect between State and Federal law, which do not

define qualified subsistence users in the same way. Federal law looks to community of residence to define a qualified subsistence user. 36 C.F.R. § 242.5. When individuals who formerly qualified as subsistence users under Federal law leave their communities, they lose their standing as subsistence hunters under Federal law—but not under State law. This disconnect is confusing to the public and, relevant here, leads to an incongruous situation in which hunters who believe themselves to be participating in traditional subsistence activities are considered "sport" hunters under Federal law and unable to participate in customary and traditional hunting practices, while "traditional" sport hunters do not engage in these practices. *E.g.*, 2020_NPS0000626 (discussing the definition of "sport" hunting as all hunting that is not defined as "subsistence" hunting), 2020_NPS0000627 (discussing comments from user communities describing their confusion with the treatment of certain practices under Federal law).

NPS's decision in the 2020 NPS Rule to remove the preemption of the State regulation allowing the take of black bears in dens in certain communities is consistent with its support for a very similar regulation adopted by the Federal Subsistence Board. 2020_NPS0009233. In its analysis of the proposal, the Federal Office of Subsistence Management ("OSM") noted that this hunting practice was "a traditional and cultural practice that has been passed down for centuries," and "is particularly important during times of need when fish and other wild resources were scarce." 2015_NPS0003408. OSM acknowledged that State authorization of this practice was adopted in 2008 in a handful of GMUs or parts of GMUs. OSM discussed the safety justification for the use

of artificial light.  *Id.*  OSM recommended supporting the proposal because of its limited scope (only applicable to residents of six communities) and its traditional and cultural importance.  *Id.*  These are the same reasons supporting the State authorization of the practice, and the same reasons NPS chose to remove the preemption in the 2020 Rule. 2020_NPS0000626; 2020_NPS0000722.  NPS' reasoning is consistent with its reasoning as part of the Federal Subsistence Board and articulates a rational connection between the facts (of limited impact and cultural importance) and choice made, and thus should be upheld under the APA.  *Nw. Ecosystem All.*, 475 F.3d at 1145.

     5.  *Using dogs to hunt black bear is an established practice in limited situations.*

The 2015 NPS Rule prohibited taking big game with the use of a dog, except for a leashed dog for tracking wounded big game.  2015_NPS0000019.  This practice is also prohibited under BOG regulations, except that ADF&G may issue a permit to hunt black bears with dogs.  5 AAC 92.085(5).  Between 2021 and 2016, ADF&G issued an average of nine permits each year to engage in this activity.  2020_NPS0000747-48. Unsurprisingly, the EA associated with the 2020 NPS Rule found "[a]ny impacts to wildlife related to using dogs to hunt black bears would be localized and minimal."  2020 NPS0000699.  The EA further pointed out that the overlap between the GMUs in which hunting black bear with dogs is permitted and National Preserves is extremely low.  *Id.* Plaintiffs do not discuss the lifting of this restriction in their summary judgment brief— perhaps because it is difficult to challenge the reasonableness of the NPS' decision and

explanation of why it chose not to preempt an extremely limited, State-authorized harvest practice, which is not expected to have detrimental effects on wildlife.

6. *Taking swimming caribou or taking caribou from motorboats under power is an established practice in certain situations.*

The 2015 NPS Rule prohibited the taking of swimming big game animals. 2015_NPS0000019.  This is also a prohibited practice under State law, with the limited exception of swimming caribou in GMU 23.  5 AAC 92.085(7).  The final EA for the 2020 Rule explained that removing the preemption of the limited State-authorized season "***could*** result in localized impacts," but was unlikely to do so because "non-local hunters are generally not known to harvest swimming caribou, preferring to hunt on land."  2020 NPS0000699 (emphasis added).  Therefore, the EA explained its conclusion that, "[d]ue to the low level of additional take of caribou expected under the proposed action, no meaningful population-level impacts are expected."  *Id.*[25]  NPS' determination in the 2020 NPS Rule is consistent with its support of the use of this method of harvest by federally qualified subsistence users.  2020_NPS0009238.  That consistency in decision-

---

[25] Comments submitted in response to the proposed rule leading to the adoption of the 2015 NPS rule asserted that taking swimming caribou did not qualify as fair chase, and NPS at that time agreed.  2015_NPS0000013.  However, NPS at that time also acknowledged comments that the take of swimming caribou is only practiced in a traditional manner by formerly-qualified subsistence users—which is reinforced by the limited scope of the State-authorization of this practice.  *Id.*; *see also* 2015_NPS0012093 (internal handwritten NPS notes from "Wildlife/Reg Mtg" dated April 10, 2015, acknowledging "swimming caribou / very little impact").

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

making in part helps to explain, and support, the reasonableness of NPS' change in position.

H.  NPS fully explained its change of position.

Contrary to Plaintiffs' final argument, NPS in the 2020 NPS Rule demonstrated awareness that it was departing from the 2015 Rule (by explicitly repealing the preemption provisions in the 2015 Rule), and explained the relatively few changes in factual determination between the 2020 NPS Rule and the 2015 NPS Rule.  This explanation was all that NPS needed to do to comply with the Supreme Court's governing precedent, *Fox Television v. F.C.C.*, 556 U.S. 502, 514-15 (2009), which holds that an agency is free to change its mind, so long as the agency "display[s] awareness that it *is* changing position," and provides an explanation for any "factual findings that contradict those which underlay its prior policy…." *Id*. (emphasis in original).  As with any decision, the agency should discuss its reasoning, but it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old policy…." *Id*. (emphasis in original).

Plaintiffs do not contend that NPS was unaware of its change in position.  How could they, when the 2020 NPS Rule explicitly repeals the 2015 NPS Rule?  Further, the agency explained its change of position on legal and policy issues, and more than adequately explained any change of position on factual issues.  NPS repeatedly pointed out that there was very little change in fact-finding, and the primary change was the application of policy to the facts found.  *See, e.g.*, 2020_NPS0000627-28 (analysis of

NPS Management Policies 2006 provisions); 2020_NPS0000628-629 (detailed re-examination of alleged safety issues for use of bait to hunt black bear, noting lack of reported incidents of the public being attacked by bears in relating to use of bait, and noting the State-mandated buffer zones between registered bait stations and places of human habitation); 2020_NPS0000630 (finding that predator population levels will not be manipulated in an unnatural way, noting previously unavailable harvest data from 2012-2016).[26]

Critically, NPS did not change its position from the 2015 NPS Rule on the essential factual issue of whether the State hunting rules will significantly affect species population levels on National Preserves.  In the 2015 NPS Rule, NPS acknowledged that "[t]his rule is not based on particular wildlife population levels, and did not require preparation of data on those levels."  2015_NPS0000019.  In other words, in 2015 NPS did not have "data" that the State hunting rules would have a significant impact on the populations of predators on National Preserves, but decided to preempt anyway, for alleged legal or policy reasons.  *Id.* ("Rather the rule reflects the NPS responsibility to manage national preserves for natural processes, including predator-prey relationships ….").  Contrary to Plaintiffs' assertion, NPS did not change its factual position, but changed its position after obtaining better facts.  NPS preempted in 2015 despite having no wildlife population data to support that preemption, and then in 2020 repealed that

_____

[26] *See also* discussion in Section G above of the specific, formerly-preempted regulations and NPS' explanations of its reasons for choosing not to preempt.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

preemption after it obtained data showing the very limited impact of the State hunting practices on wildlife populations. 2020_NPS0000627.

To be sure, NPS changed its position on the legal and policy issues, as it was entitled to do under *Fox Television Services*, but it explained that change. Contrary to Plaintiffs' assertion (ECF 47 at 31-43), NPS is allowed to change its mind, including based on policy reasons, as long as it explains itself and its explanation is rational. NPS fully met this burden in the 2020 NPS Rule:

> The NPS acknowledges that the State made similar assertions about the purpose of the harvest methods subject to this rule in its comments on the 2015 [NPS] Rule and related environmental assessment (2014 EA), and that the NPS reached a different conclusion then. In reaching this conclusion, the NPS has carefully considered its statutory requirements and authorities, including that its policies must be applied consistent with ANILCA, all of the State's representations and explanations regarding its purposes for the harvest practices, as well as the fact that the NPS's own environmental analysis finds that allowing the harvest methods identified in this rule will still support healthy populations of wildlife within preserves. These findings are supported by 2012-2016 harvest data provided by the State to the NPS.

2020_NPS0000627.

I.  Public Law 115-20 supports NPS's decision to repeal the 2015 NPS Rule.

On August 5, 2016, the FWS published a final rule restricting many of the same hunting methods and means at issue here on National Wildlife Refuges in Alaska (the "2016 Refuges Rule"). 81 Fed. Reg. 52,248.[27] In early 2017, Congress passed a joint

---

[27] The preempted State regulations included bear baiting, extended wolf and coyote hunting seasons, and "predator control."

resolution disapproving the 2016 Refuges Rule under the Congressional Review Act, 5

U.S.C. § 801 ("CRA"), and these were signed into law as Public Law 115-20. Public

Law 115-20 "disapproves" the 2016 Refuges Rule and directs that it "shall have no force

or effect." Public Law 115-20 was upheld against Constitutional challenges by both this

Court, and the Ninth Circuit. *Ctr. for Biological Diversity v. Zinke*, 313 F. Supp. 3d 976

(D. Alaska 2018), aff'd, 946 F.3d 553 (9th Cir. 2019).

In upholding Congress' rejection of the 2016 Refuges Rule, the Ninth Circuit held

that Public Law 115-20 is "enforceable as a change to substantive law," including

ANILCA. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019).

The Ninth Circuit stated that "[w]hen Congress enacts legislation that directs an agency

to issue a particular rule, 'Congress has amended the law.'" *Id.* (quoting *All. for the Wild

Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)). Public Law 115-20 rejected

the 2016 Refuges Rule that was purportedly adopted under the authority of ANILCA.

This Congressional rejection operates as a substantive amendment to ANILCA, even if

not expressly stated in Public Law 115-20. *Id.*[28]

    1. *Public Law 115-20 is the most recent expression of Congressional intent.*

---

[28] The lack of an explicit amendment to ANILCA does not change the substantive result
of the amendment. *All. for the Wild Rockies*, 672 F.3d at 1174-75 (holding action under
the CRA that effectively amends a substantive law need not be explicit with respect to the
amendment); *see also Friends of Animals v. Jewell*, 824 F.3d 1033, 1045 (D.C. Cir.
2016) (upholding legislation that required FWS to reissue regulation previously struck
down under the Endangered Species Act ("ESA") despite not amending the ESA itself).

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

36

Public Law 115-20 undermines Plaintiffs' lawsuit in two ways. First, independent of the "no-reenactment" clause in the CRA discussed below, Public Law 115-20 reflects Congressional intent to not preempt State regulations allowing extended hunting for predators on federal conservation units in Alaska. To be sure, there are differences between National Wildlife Refuges and National Preserves, but both types of units are managed by DOI, hunting on both types of units is governed by 16 U.S.C. § 3102, and there are substantial similarities between the 2016 Refuges Rule abrogated by Public Law 115-20 and the 2015 NPS Rule repealed by NPS in the 2020 NPS Rule. The fact that Congress in abrogating the 2016 Refuges Rule in Public Law 115-20 did not also abrogate the 2015 NPS rule is irrelevant because the window of time for CRA review of the 2015 Rule had already closed.[29] Further, Public Law 115-20 is the most recent statute bearing on these issues, and thus was the most recent action reflecting Congressional intent available to NPS when it adopted the 2020 NPS Rule repealing the 2015 NPS Rule.

NPS at the very least had the discretion to choose to consider Public Law 115-20 as reflecting Congressional intent that State rules authorizing hunting of predators be allowed to operate on federal conservation units. As acknowledged by NPS, the 2015 NPS Rule interfered with those State rules by preempting multiple Alaska regulations

_____

[29] *See also* 163 Cong. Rec. S1868 (Mar. 21, 2017) (remarks of Sen. Murkowski) ("The National Park Service's rule is outside the reach of the Congressional Review Act. So while, in my view, that also deserves repeal, it is not the focus of our debate today.") In practice, CRA resolutions are only enacted shortly after changes in Presidential Administrations, because a President is unlikely to sign a resolution abrogating the work of an agency whose officers he appointed himself.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

within National Preserves, and the 2015 Rule was also inconsistent with the legal regime governing National Wildlife Refuges in Alaska after enactment of Public Law 115-20. 2020_NPS0000623 (stating, "this action by Congress (PL 115-20) was taken into account when interpreting consistency with the authorities and principles that were common to both rulemakings, including statutory requirements for wildlife management activities to be carried out under State law, as well as in considering how to complement regulations on surrounding lands and waters to the extent legally practicable"). NPS's discussion shows an agency properly considering the policy impact of Congressional action.

The remarks of the resolution's sponsors (Senators Sullivan and Murkowski and Representative Young) could not have been clearer that the intent was to reaffirm Alaska's authority to manage its wildlife, including through the hunting of predators on Federal conservation land units. When presenting this CRA resolution, Representative Young stated: "The Alaska National Interest Lands Conservation Act in 1980 further, in fact, verified what the Statehood Act did: protecting the right of the State to manage fish and game."[30] Senator Sullivan stated:

> Many Alaskans didn't like [ANILCA]. Several saw this as a massive
> Federal usurpation of our land, but our congressional delegation fought to
> include explicit provisions in this Federal law that made it abundantly clear
> that the State of Alaska still had primacy in managing fish and game
> throughout the entire State—State lands and Federal lands. [] ANILCA, …
> declares that the State of Alaska has jurisdiction over the management of

---

[30] 163 Cong. Rec. H1260 (Feb. 16, 2017) (remarks of Rep. Young).

fish and wildlife on public lands throughout the State. That is the Federal law.[31]

Senator Murkowski likewise stated:

> So let's not get confused here and think that because we have Federal lands, somehow or other the States do not have primacy when it comes to management of fish and wildlife. Alaska holds legal authority to manage the fish and wildlife within its borders. This is clear. This is unambiguous. Congress explicitly provided that authority specifically to our State in not one, not two, but three separate laws. The first of these is the Alaska Statehood Act; then the Alaska National Interest Lands Conservation Act—ANILCA; and the third authority was through the National Wildlife Refuge System Administration Act. In three separate authorities, Congress made it clear: Alaska, you are to manage the fish and wildlife within your borders.[32]

Because the resolution was specific to Alaska, was sponsored by Alaska's Congressional Delegation, and does not contain explanatory statutory text, the remarks of Alaska's Congressional Delegation are properly considered in evaluating the intent and policy underlying the abrogation of the 2016 Refuges Rule, which was clearly not limited to National Preserves.

Plaintiffs contend that the CRA itself precluded NPS from considering Public Law 115-20 in crafting the 2020 NPS Rule. ECF 47 at 22 n.106. But this argument ignores the Ninth Circuit precedent discussed above that Public Law 115-20 is a substantive amendment to ANILCA as well as the plain language of the CRA. The CRA provides: "If the Congress does not enact a joint resolution of disapproval under section 802

---

[31] 163 Cong. Rec. S1864-65 (Mar. 21, 2017) (remarks of Sen. Sullivan).

[32] 163 Cong. Rec. S1868 (Mar. 21, 2017) (remarks of Sen. Murkowski).

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

39

respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval." 5 U.S.C. § 801(g). Thus, an agency is only barred from discerning intent when Congress "***does not*** enact a joint resolution of disapproval." 5 U.S.C. § 801(g) (emphasis added). By implication, an agency ***should*** "consider congressional intent in considering enacted resolutions."[33] Here, NPS properly considered the clear intent of Congress to reaffirm Alaska's sovereign authority to manage its wildlife when it revised the 2015 NPS Rule through the 2020 NPS Rule. 2020_NPS0000623.

2. *Public Law 115-20 bars the adoption or re-adoption of a substantially similar rule.*

Public Law 115-20 impacts this case in a second and different way. The CRA's "no reenactment" clause bars the ***relief*** Plaintiffs' seek, which is a reinstatement ***in 2022*** of the 2015 NPS Rule, through judicial invalidation of the 2020 NPS Rule that repealed the 2015 NPS Rule. The "no reenactment" clause bars adoption of a rule that is "substantially the same" as a rule abrogated by the CRA. 5 U.S.C. § 801(b)(2). The "no reenactment" clause only applies to rules adopted ***after*** the CRA resolution, which confirms that the 2015 NPS Rule, which pre-dated Public Law 115-20, continued in effect until NPS repealed it in 2020. *See id.* However, Plaintiffs through this case now

---

[33] Adam M. Finkel & Jason W. Sullivan, *A Cost-Benefit Interpretation of the "Substantially Similar" Hurdle in the Congressional Review Act: Can OSHA Ever Utter the E-Word (Ergonomics) Again?*, 63 Admin. L. Rev. 707, 732 n.122.

seek to reinstate the 2015 NPS Rule in 2022, which would post-date Public Law 115-20, thereby bringing the "no reenactment" clause into play. This timing distinguishes the 2015 NPS Rule Plaintiffs seek to in reinstate in this case from the FWS Kenai Refuge Rule that was never administratively repealed and so was not the subject of attempted reinstatement after enactment of Public Law 115-20.[34]

To apply the "no reenactment" clause, the agency should look to Congress' reasons for the disapproval to determine what future regulations may be permitted: "[T]he debate on any resolution of disapproval [should] focus on the law that authorized the rule and make the congressional intent clear regarding the agency's options or lack thereof after enactment of a joint resolution of disapproval."[35] *See* discussion above of the remarks of the sponsors of Public Law 115-20.

A side-by-side comparison confirms the deep parallelism and similarity of the CRA-abrogated 2016 Refuges Rule and the 2015 NPS Rule. Both rules preempted state predator hunting rules and perceived state predator-reduction rules statewide, throughout

---

[34] *See Safari Club*, 31 F.4th at 170 ("The Kenai Rule is not a 'new rule' relative to the Refuge Rule because the Kenai Rule is the older of the two rules, a fact that the State admits.").

[35] Rep. Henry Hyde, *Congressional Record*, daily edition, vol. 142 (Apr. 19, 1996), p. E577. The sponsors noted that "no formal legislative history was prepared to explain" the CRA, and the statement was "intended to cure this deficiency." *Id.* pp. E574-575. *See also* Congressional Research Service, THE CONGRESSIONAL REVIEW ACT (CRA): FREQUENTLY ASKED QUESTIONS 20 (Nov. 12, 2021) (In light of this legislative history, agencies considering reissuing rules may look to the reasons Congress gave, if any, for striking down the rule in the first place.).

Alaska, rather than in a unit-specific localized manner, and both rules apply to conservation units for which hunting is governed by 16 U.S.C. § 3202 (National Wildlife Refuges for FWS, National Preserves for NPS). Both rules on that statewide basis preempted and prohibited: (1) using bait to hunt brown bear, (2) extended hunting season of wolves and coyotes, (3) any state rules classified as predator reduction, with FWS using the terminology "predator control" and NPS using the terminology "predator reduction," and the two DOI agencies defining those terms very similarly.[36] The 2016 Refuges Rule and the 2015 NPS Rule are "substantially the same," and so 5 U.S.C. § 801(b)(2) applies and bars Plaintiffs' effort to force re-adoption in 2022 of the 2015 NPS Rule. [37]

> 3. *Public Law 115-20 also bears upon NPS's motion for remand without vacatur, which Intervenors' support.*

To recap, should the Court decide to affirm NPS' adoption of the 2020 NPS Rule, Plaintiffs are due no relief and the CRA's "no reenactment" clause is irrelevant. If instead, the Court determines that NPS erred in adopting the 2020 NPS Rule, but also

---

[36] *Compare* former 50 CFR 36.2 and 36.32(b) and (d)(v) (appendix to the 2016 Refuges Rule) *with* former 36 CFR 13.42(f) and (g) (2016) (appendix to the 2015 NPS Rule).

[37] The Ninth Circuit's holding that the 2015 rule, applicable only to the Kenai National Wildlife Refuge, was not substantially the same as the 2016 Refuges Rule is readily distinguishable because the Kenai Refuge Rule accounted for local conditions specific to one Refuge while the 2016 Refuges Rule and the 2015 NPS Rule were parallel efforts to bar perceived predator reduction efforts on a statewide non-localized basis. *See Safari Club*, 31 F.4th at 1170 ("The Refuges Rule blanketly excluded the baiting of brown bears and State predator control programs from all national wildlife refuges in Alaska. …. The Kenai Rule does not do this. It only forbids baiting of brown bears in the Kenai Refuge and prohibits the hunting of coyotes, lynx, and wolves within the Skilak WRA.").

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

concludes that the 2015 NPS Rule and the CRA-abrogated 2016 Refuges Rule are "substantially the same," then the CRA forbids re-adoption of the 2015 NPS Rule. That outcome would bar Plaintiffs from obtaining their requested relief of reinstating the 2015 Rule, but would not prevent the Court from remanding the 2020 NPS Rule without vacatur, as requested by NPS in ECF 64, so that NPS could consider adopting a new rule that is not substantially the same as the 2016 Refuges Rule. 5 U.S.C. § 801(b)(2).

Alternatively, should this Court conclude that the 2015 NPS Rule has significant similarities to the 2016 Refuges Rule (e.g. the preemptions of any state rule classified as predator reduction, the ban on hunting brown bear with bait, the ban on hunting wolves and coyotes between May and August), but falls short of being "substantially the same" as the 2016 Refuges Rule, then Congress's action to abrogate the 2016 Refuges Rule would still be a factor weighing heavily in favor of NPS's pending motion to remand without vacatur. It would be incongruous to grant a remedy that judicially reinstates the 2015 NPS Rule that bears such remarkable similarities to a rule subsequently abrogated by Congress under the CRA, when the more restrained remedy of remand without vacatur is both available and actively sought by the defendant federal agency. NPS has stated an intent to begin a rulemaking to reconsider these issues, which necessarily includes weighing the policy as well as the legal impact of Public Law 115-20 on the proper administration of DOI conservation lands in Alaska.[38]

---

[38] *See* Point I.1 for discussion of the remarks of the sponsors of Public Law 115-20 explaining why Congress acted to abrogate the 2016 Refuges Rule.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

## Conclusion

For the reasons stated above, NPS has the lawful discretion to choose not to preempt the State hunting rules at issue in this case. Thus, NPS did not err in adopting the 2020 NPS Rule, which repealed the preemptive 2015 NPS Rule. The Court should affirm the 2020 NPS Rule and deny Plaintiffs' motion for summary judgment and grant summary judgment to Intervenors and NPS.

Respectfully submitted this 17th day of May, 2022.

/s/ James H. Lister
James H. Lister (AK Bar 1611111)
Birch Horton Bittner & Cherot, P.C.
1100 Connecticut Ave., NW, Ste. 825
Washington, D.C. 20036
(202) 659-5800 (Tel)
(202) 659-1027 (Fax)
jlister@bhb.com

*Attorney for Intervenor-Defendants*
*Alaska Professional Hunters Association*
*and Sportsmen's Alliance Foundation*

/s/ Kirk Schwalm
Kirk Schwalm (AK Bar 1011064)
Downes, Tallerico, & Schwalm Law Firm,
LLC
29 College Road, Unit 5
Fairbanks, Alaska 99701
(907) 474-4529 (Tel.)
(907) 531-1451 (Fax)
kirk@goldenheartlaw.com

Cheryl Rawls Brooking (AK Bar
9211069)
State of Alaska Department of Law
1031 W. 4th Avenue
Anchorage, Alaska 99501

Brent Cole (AK Bar 8606074)
821 N. Street, Suite 208
Anchorage, Alaska 99501
(907) 277-8001 (Tel.)
(907) 277-8002 (Fax)
brent@akcole.com

/s/ Regina Lennox
Regina Lennox (admitted pro hac vice)
Jeremy Clare (admitted pro hac vice)
Safari Club International
501 Second Street, NE
Washington, D.C. 20002
(202) 543-8733 (Tel.)
(202) 543-1205 (Fax)
rlennox@safariclub.org
jclare@safariclub.org

*Attorneys for Intervenor-Defendant*
*Safari Club International*

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG

44

(907) 269-5232 (Tel.)
(907) 276-3697 (Fax)
cheryl.brooking@alaska.gov

*Attorneys for Intervenor-DefendantState
of Alaska*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) because it contains 12,116 words, excluding the parts of the brief exempted by Local Civil Rule 7.4(a)(4).[39]

*/s/ James H. Lister*
James H. Lister (AK Bar 1611111)


## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2022, a copy of the foregoing was served by electronic means on all counsel of record using the Court's CM/ECF system.

*/s/ James H. Lister*
James H. Lister (AK Bar 1611111)

---

[39] The Court previously granted Intervenors' unopposed motion for additional permitted word limits in its summary judgement briefing in ECF 70.  That order set a word limit for this brief of 12,500 words.

*Alaska Wildlife Alliance v. Haaland et al.*, Case No. 3:20-cv-00209-SLG