# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

ALASKA WILDLIFE ALLIANCE, *et al.*,

　　　　　Plaintiffs,

　　v.

DEBRA HAALAND, Secretary of the Interior, *et al.*,

　　　　　Defendants,

　　　　and

SAFARI CLUB INTERNATIONAL, *et al.*,

　　　　　Intervenor-Defendants.

Case No. 3:20-cv-00209-SLG

## ORDER RE MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 47 is Plaintiffs'[1] *Motion for Summary Judgment.* Intervenor-Defendants[2] responded in opposition at Docket 81, to which Plaintiffs replied at Docket 83. Federal Defendants did not file a response to the motion. Intervenor-Defendants filed a *Notice of Supplemental Authority* at Docket 99, to

---

[1] Plaintiffs are Alaska Wildlife Alliance, Alaska Wilderness League, Alaskans for Wildlife, Center for Biological Diversity, Coalition to Protect America's National Parks, Copper Country Alliance, Defenders of Wildlife, Denali Citizens Council, The Humane Society of the United States, National Parks Conservation Association, Northern Alaska Environmental Center, Sierra Club, and Wilderness Watch.

[2] Intervenor-Defendants are Safari Club International, Alaska Professional Hunters Association, Sportsmen's Alliance Foundation, and the State of Alaska.

which Plaintiffs responded at Docket 100. Oral argument was held on August 5, 2022.

## BACKGROUND

This case concerns a 2020 National Park Service (NPS) rule (2020 Rule) that permits certain hunting practices authorized under the State of Alaska's hunting regulations to take place on National Preserves in Alaska.[3] The 2020 Rule withdrew a prior rule, promulgated by NPS in 2015 (2015 Rule), that preempted State law and prohibited the hunting practices on National Preserves.[4] The 2020 Rule reverses course and defers to State management, thereby making the State's non-subsistence hunting practices applicable to National Preserves.[5] Plaintiffs are a number of environmental organizations contending that the 2020 Rule violated the National Park Service Organic Act (Organic Act), 54 U.S.C. § 100101 *et seq*.; the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3101 *et seq*.; the Congressional Review Act (CRA), 5 U.S.C. §§ 801–808; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559.[6]

---

[3] Docket 1 (Compl.); *see also* Alaska; Hunting and Trapping in National Preserves, 85 Fed. Reg. 35,181 (June 9, 2020) (codified at 36 C.F.R. pt. 13) (hereinafter "2020 Rule").

[4] *See* Alaska; Hunting and Trapping in National Preserves, 80 Fed Reg. 64,325 (Oct. 23, 2015) (previously codified at 36 C.F.R. pt. 13) (hereinafter "2015 Rule").

[5] *See* 2020 Rule, 85 Fed. Reg. at 35,182.

[6] *See* Docket 1; Docket 47 at 9, 26 (Pls.' Opening Br.).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 2 of 63

NPS promulgated the 2015 Rule to address what NPS then perceived as a conflict between State and Federal law regarding certain predator hunting practices in National Preserves in Alaska. The State-authorized hunting practices were designed to decrease predator populations with the goal of increasing opportunities for the human harvest of prey species. According to NPS in 2015, these State practices conflicted with Federal law due to the different legal frameworks at the State and Federal level.[7] The Alaska Constitution provides that the State must manage wildlife in accordance with the "sustained yield principle."[8] State law defines this principle as requiring "the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game."[9] To achieve this goal, the Alaska Board of Game (BOG) "adopt[s] regulations to provide for intensive management programs to restore the abundance of productivity of identified big game prey populations as necessary to achieve human consumptive use goals."[10]

Whereas State law permits the manipulation of natural processes to increase wildlife populations for harvest, Federal law requires the preservation of

---

[7] *See* 2015 Rule, 80 Fed. Reg. at 64,326.

[8] Alaska Const. art. VIII, § 4.

[9] Alaska Stat. § 16.05.255(k)(5).

[10] Alaska Stat. § 16.05.255(e).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 3 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 3 of 63

natural wildlife populations.[11]   Congress passed the Organic Act in 1916 "to conserve the scenery, natural and historic objects, and wild life" of the National Park System.[12]  ANILCA extends this mandate to National Preserves in Alaska.[13] NPS Management Policies, adopted in 2006, provide that NPS must "protect natural ecosystems and processes, including the natural abundances, diversities, distributions, densities, age-class distributions, populations, habitats, genetics, and behaviors of wildlife."[14]  The Management Policies expressly prohibit "activities to reduce . . . native species for the purpose of increasing numbers of harvested species (*i.e.* predator control)" on NPS lands.[15]

Congress passed ANILCA in 1980 to ensure the preservation of Federal lands in Alaska "for the benefit, use, education, and inspiration of present and future generations[.]"[16]  ANILCA also provides that the National Preserves of Alaska "shall be administered and managed . . . in the same manner as a national park . . . except that the taking of fish and wildlife for sport purposes and

---

[11] *See* 2015 Rule, 80 Fed. Reg. at 64,326.

[12] 54 U.S.C. § 100101.

[13] *See* 16 U.S.C. § 3201.

[14] 2015 Rule, 80 Fed. Reg. at 64,326 (citing Nat'l Park Serv., Management Policies 2006 § 4.1, 4.4.1, 4.4.1.2, 4.4.2 (2006)) (hereinafter "NPS Management Policies").

[15] NPS Management Policies § 4.4.3.

[16] 16 U.S.C. § 3101(a).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 4 of 63

subsistence uses, and trapping shall be allowed in a national preserve."[17]  ANILCA accordingly requires the management of National Preserves in Alaska to further two sometimes conflicting undertakings: resource preservation and hunting.

In the 2015 Rule, NPS analyzed the legislative history of both the Organic Act and ANILCA in an effort to explain its understanding of how Congress intended to strike the balance between these two undertakings.[18]  NPS noted that Representative Morris Udall said with respect to ANILCA that "[t]he standard to be met in regulating the taking of fish and wildlife and trapping, is that the preeminent natural values of the Park System shall be protected in perpetuity, and shall not be jeopardized by human uses."[19]  The Senate Committee on Energy and Natural Resources explained that "[i]t is contrary to the National Park Service concept to manipulate habitat or populations to achieve maximum utilization of natural resources."[20]  NPS accordingly concluded in 2015 that hunting practices that manipulate wildlife populations or alter natural wildlife behaviors to benefit human harvest are not consistent with the Organic Act, ANILCA, or the NPS Management Policies.[21]

---

[17] 16 U.S.C. § 3201.

[18] *See* 2015 Rule, 80 Fed. Reg. at 64,325–26; 64,334.

[19] 126 Cong. Rec. H10549 (Nov. 12, 1980) (Statement of Rep. Udall).

[20] S. Rep. No. 96-413, at 171 (1979).

[21] *See* 2015 Rule, 80 Fed. Reg. at 64,326.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 5 of 63

NPS observed in 2015 that despite these Federal directives, the State of Alaska had been allowing increasingly liberalized methods of hunting to increase the harvest of predator species. Over the course of ten years, NPS objected to over 50 State proposals intended to accomplish this objective in several National Preserves. At one BOG meeting, the BOG Chairman suggested that if NPS sought to prohibit these hunting practices in National Preserves, NPS would have to promulgate Federal rules to that effect. In response, NPS promulgated the 2015 Rule to prohibit State hunting regulations liberalizing predator hunting practices in National Preserves.[22]

The 2015 Rule expressly prohibited "predator reduction efforts," which the rule defined as "[a]ctivities or management actions . . . with the intent or potential to alter or manipulate natural ecosystems or processes (including natural predator/prey dynamics, distributions, densities, age-class distributions, populations, genetics, or behavior of a species)."[23] The 2015 Rule also prohibited the following hunting practices by non-subsistence hunters: taking black bears with artificial light at den sites, taking brown bears and black bears over bait, taking

---

[22] *See* 2015 Rule, 80 Fed. Reg. at 64,326.

[23] 2015 Rule, 80 Fed. Reg. at 64,327.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 6 of 63

wolves and coyotes during the denning season, taking swimming caribou or taking caribou from motorboats under power, and using dogs to hunt black bears.[24]

Following the 2016 presidential election, the new administration sought to prioritize the States as the primary authorities to manage fish and wildlife. Secretary of Interior Ryan Zinke directed agencies to "review all regulations, policies, and guidance pertaining to fish and wildlife conservation and management, specifically provisions that are more restrictive than otherwise applicable State provisions."[25] Secretary Zinke also signed two Secretary's Orders intended to "improve the management of game species and their habitat."[26] On April 3, 2017, Congress invoked the CRA to repeal a U.S. Fish and Wildlife Service (FWS) rule for the Alaska National Wildlife Refuges (Refuges Rule) that was nearly identical to the 2015 Rule as to the hunting practices it prohibited. As a result of the Congressional repeal of the Refuges Rule, State hunting regulations currently apply in most Alaska National Wildlife Refuges.[27] Members of both the House and Senate criticized NPS's 2015 Rule for preempting State hunting regulations,

---

[24] *See* 2015 Rule, 80 Fed. Reg. Id. at 64,327.

[25] 2020 Rule, 85 Fed. Reg. at 35,182.

[26] Sec'y of Interior, Order No. 3347, Conservation Stewardship and Outdoor Recreation (2017); Sec'y of Interior, Order No. 3356, Hunting, Fishing, Recreational Shooting, and Wildlife Conservation Opportunities and Coordination with States, Tribes, and Territories (2017).

[27] *See* 2020 Rule, 85 Fed. Reg. at 35,182.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 7 of 63

although repeal of that rule by way of the CRA was time-barred.[28] These developments spurred NPS to reconsider the 2015 Rule.[29]

The 2020 Rule amends NPS regulations to permit the State's authorized hunting practices in the National Preserves of Alaska. NPS explained that the 2020 Rule "complements State regulations by more closely aligning harvest opportunities in national preserves with harvest opportunities in surrounding lands."[30] In the 2020 Rule, the agency determined that ANILCA "mandate[s]" that NPS defer to "State laws, regulations, and management of hunting and trapping, other than for subsistence uses by rural Alaska residents in national preserves[.]"[31]

In liberalizing the hunting practices permitted in National Preserves to conform to State regulations, the agency also relied on harvest data that the State of Alaska collected from 2012 through 2016. The agency concluded that the data demonstrated that the State hunting regulations at issue in the 2015 and 2020 Rule cause low levels of additional take.[32] NPS analyzed this data, in addition to other published studies, to conclude that "allowing the State regulations to apply within National Preserves is not anticipated to cause population-level effects, and any

---

[28] *See* 5 U.S.C. § 801(d) (time bar).

[29] *See* 2020 Rule, 85 Fed. Reg. at 35,182.

[30] 2020 Rule, 85 Fed. Reg. at 35,182.

[31] 2020 Rule, 85 Fed. Reg. at 35,182.

[32] *See* 2020 Rule, 85 Fed. Reg. at 35,183–84.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 8 of 63

Case 3:20-cv-00209-SLG    Document 103    Filed 09/30/22    Page 8 of 63

reductions in opportunities for take of predator species over the long-term, or increases in prey species, are expected to be minimal and localized."[33]  Because the agency determined that the 2020 Rule would be unlikely to impact predator population levels, NPS concluded that the 2020 Rule complied with both the Organic Act and ANILCA.[34]

The 2012 to 2016 data was not available when NPS promulgated the 2015 Rule.[35]  Indeed, NPS acknowledged in 2015 that "[t]his rule is not based on particular wildlife population levels, and did not require the preparation of data on these levels."[36]  Rather, the 2015 Rule stated that it was intended to reflect NPS's "responsibility to manage national preserves for natural processes, including predator-prey relationships, and responds to practices that are intended to alter those processes."[37]

In the 2020 Rule, NPS emphasized that despite ceding to State hunting regulations, the Federal government retained limited emergency management authority.  Specifically, NPS stated that it retained a "limited closure authority" to "designate zones [in the national preserves of Alaska] where and periods when no

---

[33] 2020 Rule, 85 Fed. Reg. at 35,183.

[34] 2020 Rule, 85 Fed. Reg. at 35,183.

[35] 2020 Rule, 85 Fed. Reg. at 35,183.

[36] 2015 Rule, 80 Fed. Reg. at 64,334.

[37] 2015 Rule, 80 Fed. Reg. at 64,334.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 9 of 63

hunting, fishing, trapping, or entry may be permitted for reasons of public safety, administration, floral and faunal protection, or public use and enjoyment."[38]  And yet NPS repeatedly explained in the 2020 Rule that this closure authority was limited to "specific, local closures if, when, and where necessary to prevent unacceptable impacts."[39]

In sum, in the 2020 Rule NPS explained that "having reconsidered its prior position in light of specific mandates under ANILCA for Alaska preserves, revised guidance, new information, and the impacts permitting these hunting methods on national preserves in Alaska would have," NPS ultimately concluded that the "2015 characterization of the harvest methods as conflicting with NPS laws and policies was inconsistent with applicable law allowing hunting and trapping in national preserves."[40]

Plaintiffs filed this action seeking vacatur of the 2020 Rule on August 26, 2020.[41]  The Court permitted Safari Club International, the Alaska Professional Hunters Association, the Sportsmen's Alliance Foundation, and the State of Alaska to participate as Intervenor-Defendants.[42]

---

[38] 2020 Rule, 85 Fed. Reg. at 35,183 (quoting 16 U.S.C. § 3201).

[39] *Id*. at 35,184.

[40] *Id*. at 35,183–84.

[41] *See* Docket 1; Docket 47 at 9, 26.

[42] *See* Docket 14 (Order re: Mot. to Intervene); Docket 25 (Order re: Mot. to Intervene).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 10 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 10 of 63

Approximately two months after Plaintiffs filed their opening brief in December 2021, the Assistant Secretary for Fish and Wildlife and Parks directed NPS in a memorandum "to reassess the factual, legal, and policy conclusions that underlie the 2020 Rule and to transmit, by June 1, 2022, a proposed rule to the Office of Management and Budget for publication."[43]  Federal Defendants sought a stay of this proceeding until June 15, 2022, but the Court denied the requested stay because Defendants stated that they simply intended to reassess the 2020 Rule, not necessarily to revise it, and also because of Defendants' uncertain timeline for determining whether to revise the 2020 Rule.[44]

On March 29, 2022, Federal Defendants asked the Court to remand the challenged rule to NPS without vacatur because NPS "anticipate[d] publishing [a proposed revisionary rule] in the Federal Register by October, followed by a final rule in 2023" and that it would "propose at least significantly revising the 2020 rule."[45]  The Court denied this motion without prejudice, but indicated that Federal Defendants could renew their motion after a proposed rule had been published, at which time the Court and parties could better assess the extent to which a

---

[43] Docket 47 (Pls.' Opening Br.); Docket 52 at 1 (Mem. from Assistant Sec'y for Fish & Wildlife & Parks to Dir., Nat'l Park Serv. (Feb. 17, 2022)).

[44] *See* Docket 50 at 2 (Defs.' Mot. to Stay); Docket 61 at 11–14 (Order re Mot. to Stay).

[45] Docket 64 at 2, 8–9 (Defs.' Mot. to Remand).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 11 of 63

proposed new rule could render Plaintiffs' claims "prudentially unripe."[46]  To date, no renewed motion to remand has been filed.

The merits briefing is now before the Court for determination.

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers jurisdiction on Federal courts to review agency action.[47]

## LEGAL STANDARDS

Plaintiffs seek review of the 2020 Rule pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*.[48]  Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations."[49]

---

[46] Docket 80 at 8–9 (Order re Mot. to Remand).

[47] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[48] Plaintiffs filed a Motion for Summary Judgment, which is an appropriate mechanism to seek review of an agency action.  *See Occidental Eng'g Co. v. I.N.S.*, 753 F.3d 766, 769 (9th Cir. 1985); *Triumvirate, LLC v. Bernhardt*, 367 F. Supp. 3d 1011, 1021 (D. Alaska 2019).  *But see* L. Civ. R. 16.3.

[49] 5 U.S.C. § 706(2).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 12 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 12 of 63

The Ninth Circuit has detailed the circumstances under which an agency action is arbitrary and capricious:

> [An] agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[50]

By contrast, an agency action is proper if "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[51] When determining whether an action is arbitrary and capricious, "a court is not to substitute its judgment for that of the agency,"[52] particularly when "the challenged decision implicates substantial agency expertise."[53]

When an agency action is based on factual conclusions drawn from the administrative record, a reviewing court must determine whether those conclusions are supported by "substantial evidence."[54] "'Substantial evidence' is

---

[50] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011)).

[51] *Id.* (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[52] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (hereinafter "*State Farm*").

[53] *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).

[54] *Ctr. for Biological Diversity*, 900 F.3d at 1068; see also *Dickinson v. Zurko*, 527 U.S. 150, 163–64 (1999).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 13 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 13 of 63

'more than a mere scintilla but less than a preponderance.'"[55]  This standard is "extremely deferential," requiring the reviewing court to "uphold the [agency's] findings unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result."[56]

Agency action is "not in accordance with the law" when it "conflict[s] with the language of the statute."[57]  This entails "a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[58]

The Supreme Court addressed what the APA requires when an agency changes its policy in *FCC v. Fox Television Stations, Inc.*[59]  Per *Fox*, "a policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for

---

[55] *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[56] *Monjaraz-Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003) (quoting *Singh-Kaur v. I.N.S.*, 183 F.3d 1147, 1149–50 (9th Cir. 1999)).

[57] *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, 537 F.3d 1006, 1014 (9th Cir. 2008) (quoting *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)).

[58] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs.*, 537 F.3d at 1014).

[59] 556 U.S. 502 (2009).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 14 of 63

disregarding facts and circumstances that underlay or were engendered by the prior policy.'"[60]

## DISCUSSION

Plaintiffs assert that NPS violated the Organic Act, ANILCA, the CRA, and the APA by revoking the 2015 Rule that had prohibited certain hunting practices in National Preserves in Alaska, otherwise permitted by the State of Alaska, that are intended to reduce predator populations and increase human harvest of ungulates.[61]

Plaintiffs' key contention is that Federal law requires NPS to manage Federal lands in Alaska to preserve natural ecosystems, and that predator reduction efforts conflict with this Federal mandate by altering the natural predator-prey dynamics that are associated with natural ecological processes.[62] The NPS in 2020, however, relied on new harvest data and other published studies to conclude that the State's hunting regulations have resulted in low levels of additional take of predator species. Because the Court finds that substantial evidence in the record supports this conclusion, NPS was not arbitrary or

---

[60] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fox*, 556 U.S. at 515–16 (emphasis omitted)).

[61] *See* Docket 47 at 9. *Ungulate*, Merriam-Webster, http://www.merriam-webster.com/dictionary/ungulate (last visited Sept. 12, 2022) (defining "ungulate" as "a hoofed typically herbivorous quadruped mammal").

[62] *See* Docket 47 at 26–27.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 15 of 63

capricious in its determination that the State's hunting practices previously barred by the 2015 Rule would "not threaten impairment of park resources under the Organic Act or the maintenance of healthy populations under ANILCA."[63]

However, Plaintiffs do identify several errors in the promulgation of the 2020 Rule as discussed herein. First, NPS significantly understated its statutory authority to regulate hunting in National Preserves in Alaska by containing it to a "limited closure authority."[64] Rather, ANILCA vests the Department of Interior with plenary authority to protect the national interest in Federal public lands, which includes the maintenance of sound populations of wildlife.[65] Second, NPS incorrectly "equated State sustained yield management with ANILCA's direction to maintain sound populations of wildlife and the Service's Management Policy that requires management 'for self-sustaining populations'" in a manner that is arbitrary and capricious.[66] And third, in the 2020 Rule NPS failed to comply with the requirements set forth in *Fox* with respect to its change of position from 2015 on bear baiting.

---

[63] 2020 Rule, 85 Fed. Reg. at 35,183.

[64] 2020 Rule, 85 Fed. Reg. at 35,182; 35,184; 35,187.

[65] *See* 16 U.S.C. § 3101(b).

[66] Docket 47 at 36.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 16 of 63

## I. Predator Reduction Efforts in National Preserves

### a. NPS Statutory Mandates

Plaintiffs assert that the Organic Act and ANILCA preclude NPS from allowing any predator reduction efforts in National Preserves in Alaska.

"[T]he first step in interpreting a statute 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'"[67] Absent a statutory definition, "a statutory term receives its 'ordinary, contemporary, common meaning.'"[68] Often, interpreting a statutory term "requires 'examin[ing] not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy.'"[69] If the plain text of the statute is unambiguous, "that meaning controls."[70] If, however, the statutory text is ambiguous, legislative history may be consulted in determining the text's meaning.[71]

---

[67] *United States v. Kollman*, 774, F.3d 592, 596 (9th Cir. 2014) (quoting *Texaco Inc. v. United States*, 528 F.3d 703, 707 (9th Cir. 2008)).

[68] *United States v. Lopez*, 998 F.3d 431, 435 (9th Cir. 2021) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

[69] *Wilson v. C.I.R.*, 705 F.3d 980, 988 (9th Cir. 2013) (alteration in original) (quoting *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999)).

[70] *Id.*

[71] *See id.* (citing *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999)).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 17 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 17 of 63

As a preliminary matter, Plaintiffs do not follow these principles of statutory interpretation to advance their argument that the 2020 Rule's elimination of the prohibition on predator reduction efforts violates the Organic Act and ANILCA. Plaintiffs acknowledge that neither law expressly precludes predator reduction efforts.[72]  Plaintiffs instead take a holistic approach to statutory interpretation, pointing to numerous provisions of the Organic Act and ANILCA to contend that the 2020 Rule violates the entire statutory scheme.  Plaintiffs also rely extensively on the legislative history of ANILCA without identifying any ambiguous statutory text that would warrant the use of the legislative history.[73]  With this backdrop, the Court begins its inquiry with the statutory text of the Organic Act and ANILCA.

The Organic Act provides that NPS "shall promote and regulate the use of the National Park System . . . to conserve the scenery, natural and historic objects, and wild life . . . by such means as will leave them unimpaired for the enjoyment of future generations."[74]  Indeed, the Ninth Circuit has explained that Congress intended for "resource protection [to be] the overarching concern" of the Organic

---

[72] Docket 101 at 8:14–8:24 (Tr. of Oral Arg.) (Court: "[I]f you could point me to the precise language in ANILCA and/or the Organic Act that you are maintaining this rule violates?; Plaintiffs: "[T]here's not a single statutory phrase . . . . [t]he Service relied on the entire scheme and language from throughout ANILCA.").

[73] *See* Docket 47 at 27–30.  *See Wilson*, 705 F.3d at 988 ("If the statutory language is ambiguous, then we consult legislative history.").

[74] 54 U.S.C. § 100101(a).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 18 of 63

Act.[75] ANILCA provides that the National Preserves in Alaska are also subject to the Organic Act.[76] Hunting is permitted on NPS-managed lands only if it is "specifically mandated by Federal statutory law."[77] ANILCA is such a Federal law that expressly permits hunting on National Preserves in Alaska, but ANILCA also requires "the maintenance of sound populations of, and habitat for, wildlife species of inestimable value."[78] At first blush, these broad statements of purpose lend support to Plaintiffs' contention that NPS must protect natural predator-prey dynamics to conserve wildlife,[79] protect resources,[80] and maintain wildlife populations.[81]

ANILCA also provides, however, that in the National Preserves of Alaska, "the taking of fish and wildlife for sport purposes and subsistence uses, and trapping shall be allowed under applicable State and Federal law and regulation."[82] Sport and subsistence hunting, by their very nature, have the potential to alter

---

[75] *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1453 (9th Cir. 1996).

[76] 16 U.S.C. § 3201.

[77] 36 C.F.R. § 2.2(b) (2022).

[78] 16 U.S.C. § 3101(b); 16 U.S.C. § 3201 (permitting hunting).

[79] *See* 54 U.S.C. § 100101(a).

[80] *See Bicycle Trails Council of Marin*, 82 F.3d at 1453.

[81] *See* 16 U.S.C. § 3101(b).

[82] 16 U.S.C. § 3201.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 19 of 63

natural predator-prey populations levels.  And the Organic Act recognizes that the manipulation of natural wildlife populations may sometimes be necessary, as it authorizes "the destruction of such animals and plant life as may be detrimental to the use of any System unit."[83]

Accordingly, NPS is subject to two sometimes conflicting statutory mandates, requiring NPS to manage National Preserves in Alaska both to conserve and protect wildlife and to permit hunting.  The Court must give considerable weight to how NPS construes this statutory scheme to strike the appropriate balance between these mandates.[84]

Plaintiffs contend that predator reduction efforts are prohibited in the National Preserves of Alaska by the statutory scheme created by the Organic Act and ANILCA because these statutes require NPS to regulate hunting in a manner that protects the natural systems of wildlife populations.  According to Plaintiffs, predator reduction efforts defy nature by artificially reducing population levels of predators and inflating the number of prey to benefit hunters.[85]

Defendant-Intervenors respond that "[t]he statutory provisions that Plaintiffs cite from ANILCA and the Organic Act are general in nature; the provisions require

---

[83] 54 U.S.C. § 100752.

[84] *See Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 844 (1984).

[85] *See* Docket 47 at 26–30.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 20 of 63

the conservation of species and habitat, but not in the specific way Plaintiffs advocate."[86]  Defendant-Intervenors point out that these laws require NPS to protect habitat and populations, but do not compel NPS to preempt State hunting rules.[87]

To support their argument that predator reduction efforts are prohibited in the National Preserves of Alaska, Plaintiffs point to the Organic Act's requirement "to regulate uses of the National Park System—such as sport hunting in Preserves—to conserve and provide wildlife 'for the enjoyment of future generations.'"[88]  Plaintiffs further rely on ANILCA's requirement that NPS must "protect sound populations of wildlife."[89]

However, these general statements of policy do not expressly prohibit predator reduction efforts in the National Preserves of Alaska.  Rather, the two statutes direct NPS to allow hunting in a manner that maintains sound populations of wildlife.  To decide whether predator reduction efforts are permissible, NPS must determine whether these hunting practices will prevent the maintenance of sound populations of wildlife.  As discussed below, NPS considered this precise question in the 2020 rulemaking and concluded that the State's hunting practices would not

---

[86] Docket 81 at 17–21.

[87] *See* Docket 81 at 17–21.

[88] Docket 47 at 27.

[89] Docket 47 at 28.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 21 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 21 of 63

prevent the maintenance of sound populations of wildlife in the National Preserves.[90]

Plaintiffs further maintain that ANILCA expressly requires the preservation of "undisturbed ecosystems," which is inconsistent with predator reduction efforts.[91] But Plaintiffs cite this provision out of context. The full statutory clause provides that ANILCA is intended "to maintain *opportunities* for scientific research and undisturbed ecosystems."[92] ANILCA does not require that the entire ecosystem of the National Preserves in Alaska remain undisturbed.

Plaintiffs also cite to provisions in Section 410hh of ANILCA, where Congress established the various units of the National Park System in Alaska.[93] For example, Congress provided that the Bering Land Bridge National Preserve should be managed "to protect habitat for, and populations of, fish and wildlife including, but not limited to, marine mammals, brown/grizzly bears, moose, and wolves."[94] Congress also directed NPS "to protect natural processes and maintain

---

[90] *See* discussion *infra* Part I.b; 2020 Rule, 85 Fed. Reg. at 35,183 (NPS concluded that "under [the 2020 Rule], for the foreseeable future, healthy populations of wildlife will continue to exist in a manner consistent with the range of natural variability" such that "the potential effect of the harvest practices does not threaten impairment of park resources under the Organic Act or the maintenance of healthy populations under ANILCA.").

[91] Docket 47 at 10; Docket 83 at 12 n.20 (citing 16 U.S.C. § 3101(b)).

[92] 16 U.S.C. § 3101(b) (emphasis added).

[93] *See* Docket 47 at 11, 28 (citing 16 U.S.C. § 410hh).

[94] 16 U.S.C. § 410hh(2).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 22 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 22 of 63

environmental integrity" in three units of the National Park System in Alaska.[95] Plaintiffs maintain that these provisions require NPS to preserve natural processes and to protect wolf and bear populations and habitats throughout the National Preserves of Alaska.[96]

Only in Kenai Fjords National Park, however, does Congress require the protection of *natural* systems of certain wildlife populations, providing that NPS "protect seals, sea lions, other marine mammals, and marine and other birds and to maintain their hauling and breeding areas in their natural state, free of human activity which is disruptive to their natural processes."[97] By contrast, Congress did not require that predator species be protected from disruptive human activity throughout the National Preserves.[98] Rather, Congress emphasized that hunting "shall be permitted" in the National Preserves established in Section 410hh of ANILCA.[99] Accordingly, Section 410hh of ANILCA does not support Plaintiffs'

---

[95] Docket 47 at 27 (citing 16 U.S.C. § 401hh(1), (8)(a), (10)).

[96] *See* Docket 47 at 27 (citing 16 U.S.C. § 410hh(1), (2), (4)(a), (6), (7)(a), (8)(a), (9), (10) & hh-1(2), hh-1(3)(a)).

[97] 16 U.S.C. § 410hh(5).

[98] *See e.g.*, 16 U.S.C. § 410hh(6) ("to protect habitat for, and populations of, fish and wildlife including but not limited to caribou, moose, black and grizzly bears, wolves, and waterfowl").

[99] 16 U.S.C. § 410hh-2.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 23 of 63

Case 3:20-cv-00209-SLG    Document 103    Filed 09/30/22    Page 23 of 63

argument that ANILCA prohibits predator reduction efforts in National Preserves.[100]

The Court concludes that the plain text of the Organic Act and ANILCA demonstrates that predator reduction efforts are permissible in the National Preserves of Alaska, provided that these efforts do not impair the wildlife resources under the Organic Act or the maintenance of healthy populations under ANILCA.[101] Congress expressly permits hunting in the National Preserves of Alaska.[102] And Congress envisioned that the "destruction of animals" would sometimes be necessary to manage the park systems in the event that "such animals . . . [are] detrimental to the use of any System unit."[103] Moreover, Congress only requires that there are "opportunities" for "undisturbed ecosystems" in the Federal lands in Alaska.[104] These statutory mandates taken together show that NPS can permit predator reduction efforts in the National Preserves of Alaska provided that the agency strikes the proper balance between hunting and wildlife population protection.

---

[100] *See* 16 U.S.C. § 410hh(1), (2), (4)(a), (6), (7)(a), (8)(a), (9), (10) & hh-1(2), hh-1(3)(a).

[101] *See* 54 U.S.C. § 100101(a); 16 U.S.C. § 3101(b).

[102] *See* 16 U.S.C. § 3201.

[103] 54 U.S.C. § 100752.

[104] 16 U.S.C. § 3101.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 24 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 24 of 63

Although Plaintiffs do not identify any ambiguity in these statutes, this Court will assume that the statutes are ambiguous on whether predator reduction efforts are permitted so as to permit the Court's consideration of legislative history.[105] Plaintiffs rely extensively on the legislative history of ANILCA, including a report to accompany the statute that was prepared by the Senate Committee on Energy and Natural Resources (Committee) in 1979.[106] A committee report is considered an "authoritative source for finding the Legislature's intent" and "more authoritative" than statements from the floor debates.[107] And yet, committee reports have been criticized as "frail substitutes for bicameral votes upon the text of a law and its presentment to the President."[108]

The Committee's report states that "[i]t is contrary to the National Park System concept to manipulate habitat or populations to achieve maximum utilization of natural resources."[109] The Committee further advised that NPS must "maintain the natural abundance, behavior, diversity, and ecological integrity of native animals as part of their ecosystem" and "insure that consumptive uses of

---

[105] *See Wilson*, 705 F.3d at 988 (citing *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999).

[106] *See* S. Rep. No. 96-413.

[107] *Garcia v. United States*, 469 U.S. 70, 76 (1984).

[108] *Thompson v. Thompson*, 484 U.S. 174, 191–92 (Scalia, J., concurring).

[109] S. Rep. No. 96-413, at 171.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 25 of 63

fish and wildlife populations within national park service units not be allowed to adversely disrupt the natural balance."[110]  The Committee report further provides that "[i]n the face of uncertainty, Congress intended the Service to err on the side of wildlife protection."[111]

Plaintiffs do not acknowledge, however, that these statements were made in the context of the decision to permit subsistence hunting in National Parks, Monuments, Preserves, and National Recreational Areas in Alaska, whereas the 2020 Rule addresses non-subsistence hunting in National Preserves in Alaska.[112] The Committee explained that when ANILCA was drafted, "subsistence uses by local rural residents have been, and are now, a natural part of the ecosystem serving as a primary consumer in the natural food chain."[113]  It appears the Committee sought to preclude an expansion of subsistence hunting across all of these Federal lands in Alaska beyond what the Committee considered to be "natural" in 1980.[114]  That the Committee sought to impose certain standards on

---

[110] S. Rep. No. 96-413, at 171.

[111] Docket 47 at 29 (quoting S. Rep. No. 96-413, at 233 ("The greater the ignorance of the resource parameters, particularly of the ability and capacity of a population or species to respond to change in its ecosystem, the greater the safety factor must be.")).

[112] *See* S. Rep. No. 96-413, at 171 ("In authorizing subsistence uses within National Parks, Monuments, Preserves, and National Recreational Areas, it is the intent of the Committee that certain traditional National Park Service management values be maintained.").

[113] S. Rep. No. 96-413, at 171.

[114] *See* S. Rep. No. 96-413, at 168–71.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 26 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 26 of 63

subsistence hunting on a broad range of Federal lands in Alaska does not directly inform on Congress' intent with respect to the regulation of non-subsistence hunting in the more limited context of National Preserves.

Plaintiffs also do not address that the Committee anticipated that NPS would need to engage in some degree of manipulation of natural ecosystems to effectively regulate subsistence hunting on Federal lands. For example, the Committee's report provides that "the policies and legal authorities of the managing agencies will determine the nature and degree of management programs affecting ecological relationships, population dynamics, and manipulation of the components of the ecosystem."[115] This statement indicates that the Committee did not intend to completely protect animal populations from human manipulation.

In sum, the legislative history does not support interpreting either the Organic Act or ANILCA to prohibit predator reduction efforts in the National Preserves of Alaska.

### b. Findings of Fact

Plaintiffs' arguments with respect to the invalidity of the 2020 Rule are all premised on the following factual assertion: that the State hunting regulations permitted by the 2020 Rule are intended to and have the potential to manipulate

---

[115] S. Rep. No. 96-413 at 233.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 27 of 63

wildlife populations in a manner that disrupts the natural abundance of that wildlife in the National Preserves.[116]  But the Court finds that substantial evidence in the record as a whole supports NPS's finding that the contested State hunting regulations have not and do not have the potential of disrupting the natural abundance of the predator and prey populations in the National Preserves.

In the 2020 Rule, NPS relies on new evidence in the record showing that regardless of the State's intent, the hunting practices at issue would not alter the predator and prey populations in the National Preserves.  NPS stated that:

> Similar to its findings in 2015, the [Environmental Assessment] concludes that under this rule, for the foreseeable future, healthy populations of wildlife will continue to exist in a manner consistent with the range of natural variability. This conclusion is based upon the low levels of additional take that are anticipated to occur under this rule. The NPS's findings regarding low levels of additional take are based upon harvest data from 2012–2016 that were not available to the NPS when it promulgated the 2015 Rule.[117]

By contrast, when NPS decided to prohibit predator reduction efforts in 2015, the agency did not rely on any wildlife population data that would show the impact that application of the State hunting regulations would have on predator-prey populations.  In 2015, NPS instead relied on its policy expertise and legal analysis.[118]  It is well established that an agency need not rely on empirical data to

---

[116] *See* Docket 47 at 27–30.

[117] 2020 Rule, 85 Fed. Reg. at 35,183.

[118] *See* 2015 Rule, 80 Fed. Reg. at 64,334.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 28 of 63

promulgate a rule.[119]  However, it makes sense that NPS might draw different conclusions in the face of the new data it had received.

From 2012 through 2016, the State documented the number of animals harvested in parts of Alaska controlled by State hunting regulations.[120]  For example, the State calculated that the extended hunting season for wolves resulted in an increase of approximately 11 wolves reported taken per year from 2012 to 2016 in geographic units that overlap with National Preserves.  Similarly, the State data showed that the State's black bear hunting regulations caused low levels of additional take.  Of the 2,300 black bears reported harvested from 2012 through 2016, approximately 34 bears per year were reported taken over bait in the geographic units overlapping National Preserves.  And from 2012 to 2016, the State issued nine permits per year for the use of dogs to hunt black bears in geographic units overlapping with National Preserves.[121]

In 2020, NPS also had access to more data with respect to the impact of bear baiting practices on brown bears.  Approximately 57 brown bears per year

---

[119] *See Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1173 (9th Cir. 2022) (citing *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010)).

[120] *See* discussion *infra* pp. 36–38 (NPS does not have any population data to which to compare the harvest data, but the agency nonetheless routinely relies on harvest data to anticipate the impact of State hunting regulations on populations because of the difficulty and cost associated with collecting population data).

[121] *See* Docket 85-2 at 152-53, 155.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 29 of 63

were reported harvested from 2012 to 2016 in geographic areas where bear baiting was then allowed that overlap with National Preserves. The State also conducted a preliminary analysis of the impact of liberalized brown bear hunting practices and found no effect on moose populations.[122] NPS considered some contrary evidence as well. For example, a study of brown bear baiting on the Kenai Peninsula showed substantial increases in the take of brown bears. In 2014, the reported percentage of brown bears that were taken over bait was 77%; in 2015, it was 89%; and in 2016, it was 83%. NPS explained that this study is not representative of the impact of bear baiting in National Preserves because, with the exception of portions of Wrangell-St. Elias, the National Preserves are more remote and difficult to access than the Kenai Peninsula.[123] It is reasonable for NPS to draw this distinction because, as the Ninth Circuit recently recognized, the Kenai Refuge "is close to major population centers and highly accessible."[124] NPS concluded that "[b]ecause baiting on most national preserves would be more difficult, the percentage of brown bears taken over bait under the proposed action is expected to be lower than the percentage reported . . . on the Kenai."[125]

---

[122] Docket 85-2 at 152 ("The department has looked at cow:calf ratios in numerous areas where brown bear seasons have been liberalized and concluded that increased bear harvest had no effect on survival of moose neonates.").

[123] *See* Docket 85-2 at 152–53.

[124] *Safari Club Int'l*, 31 F.4th at 1175 (citing 81 Fed. Reg. 27,038–39).

[125] Docket 85-2 at 153.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 30 of 63

Case 3:20-cv-00209-SLG    Document 103    Filed 09/30/22    Page 30 of 63

In addition to the State harvest data, NPS also explained that its conclusion that the State hunting regulations at issue in the 2020 Rule together result in a low level of additional take of predator species is consistent with the agency's determination in 2015.[126] It points to the NPS's "Finding of No Significant Impact" for the 2015 Rule, "which noted that neither of its alternatives was 'likely to have a significant effect on park resources.'"[127] NPS has therefore consistently determined that the State hunting regulations at issue in both the 2015 and 2020 Rules do not have a significant impact on wildlife populations in the National Preserves of Alaska.

In reliance on this evidence, NPS ultimately decided that "population-level effects that would alter the natural processes listed are unlikely."[128] That decision is based on substantial evidence in the record. Without the underlying conclusion of fact that the State hunting regulations adversely impact natural population levels in the National Preserves, Plaintiffs' arguments that the 2020 Rule violates Federal

---

[126] *See* 2020 Rule, 85 Fed. Reg. at 35,189.

[127] 2020 Rule, 85 Fed. Reg. at 35,189; Nat'l Park Serv., Finding of No Significant Impact Wildlife Harvest on National Park System Preserves in Alaska 10 (2015) ("The [Environmental Assessment] evaluation shows that neither the proposed action nor the no-action alternative is likely to have a significant effect on park resources."); Nat'l Park Serv., Wildlife Harvest On National Park System Preserves In Alaska Environmental Assessment 5 (2014) (Alternatives considered in the Environmental Assessment for the 2015 Rule were (A) No Action (Adopt All State of Alaska Wildlife Harvest Regulations) and (B) Promulgate NPS Wildlife Harvest Regulations in Alaska).

[128] 2020 Rule, 85 Fed. Reg. at 35,189.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 31 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 31 of 63

law ring hollow.  Plaintiffs nonetheless challenge NPS's conclusion of fact in the 2020 Rule that the State hunting regulations will cause low additional take of predatory species in four different ways.[129]

First, Plaintiffs contend that NPS "arbitrarily assumed that if populations remain static, impacts to natural processes, including behaviors, will be minimal."[130]  Plaintiffs point to a study in the administrative record that looks beyond the population effects of hunting by documenting the impact that the human harvest of wolves has on the social dynamics on wolf packs.[131]  But Federal law does not require NPS to manage Federal lands so as to protect wildlife from these changes to their natural behaviors.  Instead, the Organic Act and ANILCA require NPS to conserve wildlife and maintain wildlife populations.[132]  Moreover, Plaintiffs' arguments are directly contradicted by ANILCA because Congress expressly allows hunting on National Preserves.[133]  In doing so, Congress clearly did not intend to protect wildlife from unnatural human influence as hunting is

---

[129] *See* Docket 47 at 45–51.

[130] *Id.* at 46.

[131] *See* Docket 85-3 at 18 (citing Linda Y. Rutledge et al., *Protection from Harvesting Restores the Natural Social Structure of Eastern Wolf Packs*, 143 Biological Conservation 332 (2010)).

[132] *See* 54 U.S.C. § 100101(a); 16 U.S.C. § 3101(b).

[133] *See* 16 U.S.C. § 3202(c)(1).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 32 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 32 of 63

intended to end an animal's natural life and, as this study shows, can impact their social dynamics.

Second, Plaintiffs assert that "the Service found, but failed to acknowledge, that the specific practices allowed by the 2020 Rule have the potential to alter predator-prey dynamics on the Preserves."[134]  Indeed, NPS acknowledged in the Environmental Assessment (EA) that "[i]ncreased take of predator species could reduce abundance of bears and wolves or increase abundance of prey in localized areas."[135]  But the inquiry did not end there.  NPS explains that after reviewing relevant studies and data, including the State's new population data, "meaningful population-level effects on predator or prey species are not expected."[136]  ANILCA directs NPS to maintain wildlife populations, but does not prohibit any localized impacts of hunting, so NPS did not err by according more weight to the population data.[137]

---

[134] Docket 47 at 46.

[135] Docket 85-2 at 152 (Nat'l Park Serv., Sport Hunting and Trapping in National Preserves in Alaska Revised Environmental Assessment (2019) (Environmental Assessment for the 2020 Rule concludes that "Increased take of predator species could reduce abundance of bears and wolves or increase abundance of prey in localized areas.  However, based on a review of relevant studies, data, and other information including input from the Alaska Department of Fish and Game (ADFG), meaningful population-level effects on predator or prey species are not expected.")).

[136] Docket 85-2 at 152.

[137] See 16 U.S.C. §§ 3101(b), 3202(c)(1).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 33 of 63

Third, Plaintiffs maintain that NPS "failed to support its conclusion that even low levels of additional take would ensure its continued compliance with statutory mandates," especially because, according to Plaintiffs, NPS defines "low levels" of harvest to be "less than 40%" of the total population.[138]   But Plaintiffs mischaracterize the record when they claim that NPS defined low levels of take to mean less than a 40% reduction in predator populations.[139]   Instead, NPS acknowledged a study of the effects of hunting on wolf populations suggesting that wolf numbers decline when hunting take exceeds 40% of the wolf population.[140]   NPS observed that "[s]ince preserves are generally remote and access is limited, the level of take on preserves under the proposed action is expected to be much less than 40% of predator populations."[141]   Indeed, the State harvest data showed that the extended hunting season for wolves resulted in an increase of only approximately 11 wolves reported taken per year.[142]   NPS's discussion of the wolf study did not establish a 40% threshold below which impacts were considered to be low.

---

[138] Docket 47 at 39–41.

[139] *See* Docket 47 at 40; Docket 101 at 13:16–14:13; 27:9–27:25.

[140] *See* Docket 85-2 at 152 ("[E]stimates of the effects of [hunting] harvest on the wolf population were that wolf numbers were reduced following two years when the harvest exceeded 40% but that wolf numbers increased the following year when the harvest was less than 35%.").

[141] Docket 85-2 at 152.

[142] *See* Docket 85-2 at 152.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 34 of 63

Fourth, Plaintiffs challenge the reliability of the data upon which NPS relied. Plaintiffs point out that the State's harvest data does not have any context because NPS lacks population data to which to compare that data.[143] Plaintiffs also contend that NPS erred by relying on data that is not specific to the National Preserves because the preserves are "world-renowned destinations" and it is unreasonable to assume that they will attract the same number of hunters as the lesser-known areas studied.[144] Plaintiffs further maintain that the State's data is inadequate because the State has "largely abandoned" its monitoring efforts.[145]

NPS explained that the data necessary to evaluate the impacts of hunting regulations on predator-prey populations is difficult and costly to obtain. NPS also acknowledged the limits of the data it relied on, including the fact that the data is inconsistently collected and that the National Preserves comprise less than 11% of the land areas studied. Although this data may be less than ideal, NPS explained that the agency routinely evaluates historical harvest data, like the agency did in the 2020 rulemaking, to assess the likely impacts of State regulations.[146]

---

[143] *See* Docket 47 at 50.

[144] Docket 47 at 47.

[145] Docket 47 at 50, n.193.

[146] *See* 2020 Rule 85 Fed. Reg. at 35,189.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 35 of 63

The Ninth Circuit has held that "[i]n such a situation, where the record is devoid of pre-existing studies to clarify the impact of policies on threatened animal species, the default rule is to rely on a specialized Federal agency's presumptive expertise in the subject."[147]  The Court must be especially deferential when the agency "is making predictions, within its area of special expertise, at the frontiers of science."[148]  In light of this deference due, NPS's conclusion from the available data that the 2020 Rule will result in low levels of additional take such that NPS will continue to fulfill its statutory duty to "conserve . . . wild life"[149] and "maintain[] . . . sound populations of . . . wildlife species of inestimable value"[150] is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[151]

In sum, substantial evidence in the record supports the agency's finding in the 2020 Rule that the State's hunting regulations, including predator reduction efforts, will not adversely impact wildlife populations in the National Preserves.

---

[147] *Safari Club Int'l*, 31 F.4th at 1174.

[148] *Balt. Gas and Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

[149] 54 U.S.C. § 100101(a).

[150] 16 U.S.C. § 3101(b).

[151] *State Farm*, 463 U.S. at 43.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 36 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 36 of 63

### c. Good Reasons

Plaintiffs also maintain that in the 2020 Rule, NPS changed its position on predator reduction efforts without providing the "good reasons" for this new policy that are required by the Supreme Court in the seminal case of *FCC v. Fox Television Stations*.[152]  Specifically, Plaintiffs contend that NPS's explanations are inadequate because NPS impermissibly "elevated hunter opportunity and consistency with State regulations above its obligation to regulate the System to conserve wildlife and protect bears and wolves within almost all the Preserves."[153]

The problem with Plaintiffs' argument is that the new population data provided by the State of Alaska shows that these State hunting regulations do not have the effect of reducing predator populations and increasing prey populations.[154]  Because the 2020 Rule does not reduce predatory populations, NPS is not prioritizing hunter opportunity or consistency with State law in a manner that would violate NPS' Federal mandates.

NPS provided many reasons for its decision to remove the predator reduction efforts prohibition.  For example, NPS explained that the 2020 Rule is intended to "expand harvest opportunities."[155]  The State of Alaska submitted

---

[152] *Fox*, 556 U.S. at 515-16.

[153] Docket 47 at 40.

[154] *See* 2020 Rule, 85 Fed. Reg. at 35,183; Docket 85-2 at 152–55.

[155] 2020 Rule, 85 Fed. Reg. at 35,189.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 37 of 63

Case 3:20-cv-00209-SLG    Document 103    Filed 09/30/22    Page 37 of 63

comments in 2014 and 2018 stating that the intent of the State hunting regulations is to increase hunter opportunity and not to decrease predator populations. The State's comments said that the State hunting regulations at issue in the 2020 Rule "simply reflect the existence of an abundant population of wildlife and a small segment of the public's desire to hunt them that fit within the sustained yield concept of scientific management Alaska follows."[156]  Moreover, the 2020 Rule noted its consistency with hunting regulations at several national parks located in the lower 48 states, where 25 national park units allow year-round coyote hunting, six national park units permit the use of artificial light for hunting, seven national park units allow hunting of black bears with dogs, and four national park units permit bear baiting to harvest black bears.[157]  NPS further justified its decision by explaining that the 2020 Rule "defer[red] to the State in regard to fish and wildlife management."[158]  This decision is consistent with Secretary Zinke's orders.[159] NPS' final justification was that the 2020 Rule "provid[es] regulatory certainty to

---

[156] 2020 Rule, 85 Fed. Reg. at 35,186. *But see discussion infra* at 40-41, finding that NPS erred insofar as it determined that it was mandated to apply State hunting regulations in National Preserves.

[157] *See* 2020 Rule, 85 Fed. Reg. at 35,185.

[158] 2020 Rule, 85 Fed. Reg. at 35,189.

[159] *See* Sec'y of Interior, Order No. 3347, Conservation Stewardship and Outdoor Recreation (2017); Sec'y of Interior, Order No. 3356, Hunting, Fishing, Recreational Shooting, and Wildlife Conservation Opportunities and Coordination with States, Tribes, and Territories (2017).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 38 of 63

park users about what hunting practices are or are not allowed in national preserves."[160]  Comments submitted during the 2020 rulemaking show that Alaska residents were confused by the different hunting regulations in different land categories and that their confusion would be alleviated if State and NPS regulations were more consistent.[161]

To survive judicial review, NPS "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."[162]  Instead, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."[163]  Here, NPS provided good reasons based on substantial evidence for its determination that the State's hunting regulations would not disrupt the abundance of predator wildlife in the National Preserves in Alaska.[164]

## II.    Conflicts with Federal Law

---

[160] 2020 Rule, 85 Fed. Reg. at 35,189.

[161] *See* 2020 Rule, 85 Fed. Reg. at 35,185–86.

[162] *Fox*, 556 U.S. at 515.

[163] *Id.*

[164] *But see infra* Part III.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 39 of 63

Plaintiffs contend certain aspects of the 2020 Rule conflict with the Organic Act, ANILCA, NPS Management Policies, and the CRA.

### a. The Organic Act & ANILCA

Plaintiffs contend that NPS ignored its directives under the Organic Act and ANILCA by reading the latter "as mandating deference to 'State laws, regulations, and management of hunting and trapping' in the Preserves" and reserving for NPS only a "limited closure authority."[165]  Plaintiffs maintain that NPS has effectively absolved itself of its duty to regulate hunting in violation of the Organic Act's and ANILCA's statutory mandates.[166]

The Circuit recently clarified the relationship between State and Federal hunting regulations on Federal lands in Alaska, "hold[ing] that ANILCA preserves the federal government's plenary power over public lands in Alaska."[167]  This is because Congress maintains authority by way of the Property Clause of the Constitution to regulate and protect wildlife on Federal land.[168]  The Supremacy

---

[165] Docket 47 at 25–26.

[166] *See* Docket 47 at 25–26.

[167] *Safari Club Int'l*, 31 F.4th at 1165.

[168] *See id*. at 1168 (citing *Ctr. for Biological Div. v. Bernhardt*, 946 F.3d 553, 558 (9th Cir. 2019) and *Kleppe v. N.M.*, 426 U.S. 529, 541 (1976)).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 40 of 63

Clause requires that Federal hunting regulations override conflicting State laws in accordance with the principle of conflict preemption.[169]

NPS's explanation of its authority under ANILCA in the 2020 Rule suffers from two errors. First, NPS stated that ANILCA mandates deference to the State.[170] But the Circuit reached the opposite conclusion, holding that "the Department of Interior need not defer to the State's hunting regulations."[171] More specifically, NPS found that it had to defer to the State to define harvest methods and means.[172] But the Circuit has since explicitly rejected the argument that the Federal government "cannot limit the means, method, or scope of hunting on federal lands in Alaska."[173] Relatedly, NPS incorrectly cabined its authority to a "limited closure authority."[174] But the Circuit explained that "ANILCA vests the Secretary of the Interior with plenary authority 'to protect—if need be, through

---

[169] *See id.* (citing *Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 854 (9th Cir. 2002) and *Bernhardt*, 946 F.3d at 558 (9th Cir. 2019).

[170] *See* 2020 Rule, 85 Fed. Reg. at 35,182 ("As mandated by the Alaska National Interest Conservation Act of 1980 . . . the NPS has consistently deferred to State laws, regulations, and management of hunting and trapping . . . in national preserves since their establishment in 1980.").

[171] *Safari Club Int'l*, 31 F.4th at 1168.

[172] *See* 2020 Rule, 85 Fed. Reg. at 35,184 ("ANILCA does not address specific harvest methods; rather it defers to State fish and game management to establish methods and means . . . .").

[173] *Safari Club Int'l*, 31 F.4th at 1167.

[174] 2020 Rule, 85 Fed. Reg. at 35,182.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 41 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 41 of 63

expansive regulation—'the national interest in the . . . environmental values on the public lands'" which, in Alaska, includes "maintaining 'sound populations of [] wildlife species of inestimable value.'"[175]   In sum, NPS incorrectly described its authority to regulate hunting on Federal lands in Alaska as limited and deferential to the State, but the Circuit has since held that the Federal government maintains plenary power over these lands and the authority to preempt conflicting State law.[176]

### b. NPS Management Policies

Plaintiffs maintain that the 2020 Rule violates the NPS Management Policies.   These Management Policies expressly provide that NPS "does not engage in activities to reduce the numbers of native species for the purpose of increasing the numbers of harvested species (i.e., predator control), nor does the Service permit others to do so on lands managed by the National Park Service."[177] However, the 2020 Rule does not conflict with the Management Policies' prohibition of predator reduction efforts because substantial evidence supports NPS's finding that the State hunting regulations at issue in this rule do not have

---

[175] *Safari Club Int'l*, 31 F.4th at 1169 (second alteration in original).

[176] *See id*. at 1165, 1168.

[177] NPS Management Policies § 4.4.3.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 42 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 42 of 63

the effect of reducing the natural abundance of predator species in the National Preserves.[178]

Plaintiffs correctly point out, however, that NPS improperly equated State sustained yield management with the Management Policies' requirement that NPS manage for self-sustaining wildlife populations.[179] For example, in the 2020 Rule NPS stated: "[t]he State's constitutional mandate for sustained yield is consistent with NPS Management Policies, which state that the NPS 'manages [wildlife] harvest to allow for self-sustaining populations of harvested species.'"[180] Although both State and Federal law use the term "sustain," the similarities end there. The term "sustained yield" in State law describes the human harvest of wildlife, whereas the term "self-sustaining" in the NPS Management Policies describes wildlife population levels.

The Alaska Constitution provides that "wildlife . . . belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses."[181] Sustained yield is defined by Alaska law as requiring "the achievement and maintenance in perpetuity of the

---

[178] *See* discussion *supra* Section I.b.

[179] Docket 47 at 36.

[180] 2020 Rule, 85 Fed. Reg. at 35,184 (alteration in original).

[181] Alaska Const. art. VIII, § 4.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 43 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 43 of 63

ability to support a high level of human harvest of game."[182]  State law accordingly focuses on wildlife management to benefit hunters.[183]  By contrast, Federal law prioritizes the conservation of wildlife on Federal lands in Alaska.  ANILCA requires "the maintenance of sound populations of, and habitat for, wildlife species of inestimable value."[184]   And NPS Management Polices direct the agency to "manage[] harvest to allow for self-sustaining populations of harvested species," expressly prohibiting "activities to reduce the numbers of native species for the purpose of increasing the numbers of harvested species (i.e., predator control)," and the "stocking of plants or animals to increase harvest."[185]  Accordingly, State law permits, and indeed directs, the promulgation of regulations intended to increase human harvest of species, while the NPS Management Policies expressly prohibit these same practices.

Intervenor-Defendants respond that the NPS Management Policies are unenforceable.[186]  Indeed, the Management Policies themselves provide that they are "not intended to" and do "not create any right or benefit . . . enforceable at law

---

[182] Alaska Stat. § 16.05.255(k)(5).

[183] *See* Alaska Const. art. VIII, § 4; Alaska Stat. § 16.05.255(k)(5).

[184] 16 U.S.C. § 3101(b).

[185] NPS Management Policies § 4.4.3.

[186] *See* Docket 81 at 26–27 (citing *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1072–74 (9th Cir. 2010)).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 44 of 63

or equity by a party against the United States, [or] its . . . agencies."[187]  However, the Management Policies are indirectly enforceable  because NPS's conclusion that the 2020 Rule complies with the Management Policies is subject to judicial review.

The Ninth Circuit holds that an agency action that claims to comply with a non-binding standard, but does not in fact comply with that standard, is arbitrary and capricious.  In the context of a National Environmental Policy Act (NEPA) analysis, the Circuit held: "Even assuming, *arguendo*, that the Standard does not have the independent force and effect of law . . . it would nonetheless be arbitrary and capricious for the [agency] to ignore it because . . . [the agency] claim[ed] that the Service developed the Project in compliance with its provisions."[188]  The Circuit explained further that "we would then be compelled to find that the [agency action is] misleading in violation of NEPA."[189]  The Ninth Circuit applied this holding in the context of an APA challenge to an agency action purporting to comply with a non-binding agency policy.[190]  Accordingly, NPS's conclusion in the 2020 Rule that the

---

[187] NPS Management Policies, Introduction, at 4.

[188] *Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1069 (9th Cir. 2005), *overruled on other grounds by The Lands Council v. McNair*, 537 F.3d 981, 990–94 (9th Cir. 2008).

[189] *Id*.

[190] *See River Runners for Wilderness*, 593 F.3d at 1074–76 (acknowledging that such agency action would be arbitrary and capricious, but holding that the agency action in that case did in fact comply with the agency's non-binding policies).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 45 of 63

State's sustained yield requirements are equivalent to the NPS Management Policies is arbitrary and capricious.

Plaintiffs contend further that NPS "improperly delegated its responsibility to assure compliance with federal mandates to the State."[191]  Plaintiffs note that in the text of the 2020 Rule, NPS justified its decision to delete the predator reduction efforts prohibition by invoking the State's commitment to closing hunting seasons by emergency order, or to recommend more conservative hunting regulations to the Alaska Board of Game.[192]  However, given that the State's definition of "sustainable levels" is not equivalent to Federal requirements for wildlife management on Federal lands, NPS cannot exclusively rely on the State to ensure compliance with Federal law.[193]

However, Plaintiffs overlook NPS's commitment to exercise its closure authority to ensure compliance with Federal law.[194]  NPS explained that it retains

---

[191] Docket 47 at 37.

[192] *See* 2020 Rule, 85 Fed. Reg. at 35,183 ("[T]he State has assured the NPS that, in the event harvest were to increase beyond sustainable levels, the ADFG would close seasons by emergency order, if immediate action was necessary, and/or recommend more conservative seasons, bag limits, and/or methods to the Alaska Board of Game for future hunting seasons.").

[193] *Compare* Alaska Stat. § 16.05.255(k)(5) *with* 16 U.S.C. § 3101(b) and NPS Management Policies § 4.4.3.

[194] *See* 2020 Rule, 85 Fed. Reg. at 35,184 ("The rule also does not diminish the limited closure authority of the NPS to designate areas and periods of time where sport hunting and trapping would not be allowed in national preserves . . . . [and] implement specific, local closures if, when, and where necessary to prevent unacceptable impacts.").

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 46 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 46 of 63

"closure authority . . . for enumerated purposes."[195]  NPS then analyzed its statutory duties under the Organic Act and ANILCA, concluding that the former requires that "harvest practices [do] not threaten impairment of park resources" and that the latter requires "the maintenance of healthy populations."[196]  Rather than disclaiming its authority to enforce these statutory mandates, as Plaintiffs allege, NPS committed to exercising its closure authority to close areas to hunting if necessary "to prevent unacceptable impacts."[197]  Although NPS committed to exercising its closure authority if necessary, the 2020 Rule nonetheless does not accord with the Organic Act and ANILCA because NPS improperly described its authority as limited to closure only.[198]

### c. Congressional Review Act

Plaintiffs contend that NPS violated Section 801(g) of the Congressional Review Act (CRA) when promulgating the 2020 Rule because it considered the joint resolution of disapproval of the Refuges Rule.[199]  Defendant-Intervenors respond that as a preliminary matter, the Court does not have jurisdiction to reach

---

[195] 2020 Rule, 85 Fed. Reg. at 35,182.

[196] 2020 Rule, 85 Fed. Reg. at 35,183.

[197] 2020 Rule, 85 Fed. Reg. at 35,183–84.

[198] *See* discussion *supra* pp. 41–43.

[199] *See* Docket 47 at 30 n.106.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 47 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 47 of 63

this question because of the Jurisdiction Stripping Provision of the CRA.[200]  Section 805 of the CRA provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review."[201]

Defendant-Intervenors rely on *Center for Biological Diversity v. Bernhardt*[202] to support their theory that the jurisdictional bar is applicable to agency action taken as part of the rulemaking process and alleged to violate Section 801.[203]  In *Center for Biological Diversity*, the Ninth Circuit held that it did not have jurisdiction to consider whether Congress followed the proper procedure, as set forth in the CRA, when it disapproved the Refuges Rule.[204]  The DOI had submitted the Refuges Rule to Congress and the Comptroller General, consistent with the CRA, on October 5, 2016.[205]  At the time, there were less than 60 days remaining in the 114th Congress, and when the presidential administration changed and the subsequent congressional session began, Congress passed, and the President signed into law, a joint resolution disapproving the Refuges Rule.[206]  The Center

---

[200] *See* Docket 99 at 2.

[201] 5 U.S.C. § 805.

[202] 946 F.3d 553 (9th Cir. 2019).

[203] *See* Docket 99 at 2.

[204] *See Center for Biological Diversity*, 946 F.3d at 562–64.

[205] *See id*. at 558.

[206] *See id*. at 562–64.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 48 of 63

for Biological Diversity sued, contending in relevant part that Congress had violated Section 801(a)(1)(A) of the CRA because the reporting to Congress and the Comptroller General was untimely. The Circuit considered the text of the CRA's Jurisdiction-Stripping Provision and concluded that the statute provided clear and convincing evidence that Congress intended to preclude judicial review of this statutory claim.t *Center for Biological Diversity* involved Congressional action taken pursuant to the CRA, which falls squarely within the Jurisdiction-Stripping Provision of the statute.[207] The current case involves review of an entirely separate agency action distinct from the disapproval of the Refuges Rule.

Defendant-Intervenors also cite to a Tenth Circuit case, *Kansas Natural Resources Coalition v. U.S. Department of Interior*.[208] The plaintiffs in *Kansas Natural Resources Coalition* alleged that the agency had violated Section 801(a)(1)(A) of the CRA by failing to submit a rule to Congress.[209] The Tenth Circuit held that it did not have subject matter jurisdiction to reach this question.[210] However, like *Center for Biological Diversity*, in *Kansas Natural Resources Coalition* a party sought review of agency action subject to the CRA. In contrast,

---

[207] *See id*. at 562–63.

[208] Docket 99 at 2 (citing 971 F.3d 1222 (10th Cir. 2020)).

[209] *See Kansas Nat. Res.*, 971 F.3d at 1228–29.

[210] *See id*. at 1235.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 49 of 63

this case is about agency action taken subject to the APA, the Organic Act, and ANILCA in promulgating the 2020 Rule.

The Ninth Circuit has not addressed whether the CRA's Jurisdiction-Stripping Provision prohibits judicial review of agency action, as opposed to Congressional action, as was the case in *Center for Biological Diversity*. The courts that have reached this question have not agreed.[211] Regardless, the Jurisdiction-Stripping Provision only applies to actions taken "under this chapter," referring to Chapter 8, entitled Congressional Review of Agency Rulemaking.[212] The Senate Report provides several examples of actions taken under the CRA that are not subject to judicial review, such as "major rule determinations made by the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget" and "whether Congress complied with the congressional review procedures."[213] These are actions taken pursuant to the procedures enumerated in the CRA. In this case, however, NPS acted under the

---

[211] *Compare Kansas Nat. Res. Coalition*, 971 F.3d at 1235 (holding that § 805 precludes judicial review of agency action taken pursuant to the CRA); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (same); *United States v. Carlson*, Case No. CRIM. 12-305 DSD/LIB, 2013 WL 5125434, at *14 (D. Minn. Sept. 12, 2013), *aff'd*, 810 F.3d 544 (8th Cir. 2016) (same); *and Texas Sav. & Cmty. Bankers Ass'n v. Fed. House. Fin. Bd.*, Case No. A 97 CA 421 SS, 1998 WL 842181, at *7 (W.D. Tex. June 25, 1998), *aff'd*, 201 F.3d 551 (5th Cir. 2000) (same); *with Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 201–02 (2d Cir. 2004) (reviewing a rule's effective date under the CRA); *Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1373–76 (Fed. Cir. 2002) (same).

[212] 5 U.S.C. § 805.

[213] 142 Cong. Rec. S3687, S3686 (1996).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 50 of 63

APA, and not the CRA, when it promulgated the 2020 Rule pursuant to the rulemaking procedure outlined in Section 553 of the APA.[214]  Hence, even if the Jurisdiction-Stripping Provision reaches agency action, it does not encompass action taken pursuant to the APA and not the CRA.

Courts routinely consider final rules published in the Federal Register and the rationale supporting their promulgation.[215]  It would be out of step with this standard procedure to prohibit courts from considering the reasons supporting an agency rulemaking.  Absent "clear and convincing evidence" of congressional intent to deny access to judicial review of the rulemaking process, Defendant-Intervenors fail to overcome the presumption favoring judicial review.[216]  Accordingly, the Court has jurisdiction to determine whether, in promulgating the 2020 Rule, NPS erred when it relied on Congress' disapproval of the Refuges Rule.

In the 2020 Rule, NPS explained its decision to reconsider portions of the 2015 Rule was based in part on the passage of a joint resolution of disapproval by Congress on April 3, 2017, that repealed the Refuges Rule.[217]  The Refuges Rule was similar in substance to the 2015 Rule insofar as it prohibited certain State

---

[214] *See* 5 U.S.C. § 553.

[215] *See Chevron*, 467 U.S. 837; *State Farm*, 463 U.S. 29.

[216] *See Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991).

[217] *See* 2020 Rule, 85 Fed. Reg. at 35,182.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 51 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 51 of 63

hunting practices on Federal land.  The House and Senate sponsors of the joint resolution for the Refuges Rule criticized the 2015 Rule.[218]  NPS in 2020 said with respect to the joint resolution that

> [w]hile refuges operate under different frameworks than national preserves, this action by Congress was taken into account when interpreting consistency with the authorities and principles that were common to both rulemakings, including statutory requirements for wildlife management activities to be carried out under State law, as well as in considering how to complement regulations on surrounding lands and waters to the extent legally practicable.[219]

Relying on the legislative history regarding the Refuges Rule, NPS inferred in the 2020 Rule that Congress did not approve of the policies underpinning the 2015 Rule.[220]

Plaintiffs assert that "[t]he CRA itself bars federal agencies from inferring congressional intent from actions under the CRA except regarding the specific, invalidated rule."[221]  Plaintiffs rely on Section 801(g), which provides "[i]f the

---

[218] *See* Cong. Rec. S1864, S1868 (daily ed. Mar. 21, 2017) (*See, e.g.*, statement of Sen. Murkowski: "[T]he National Park Service in 2015 and the Fish and Wildlife Service in 2016 took it upon themselves to propose regulations to take control [of wildlife] away from Alaska, despite what was contained in our Statehood agreement, in ANILCA, and in the National Wildlife Refuge Administration Act.  The National Park Service's rule is outside the reach of the Congressional Review Act.  So while, in my view, that also deserves repeal, it is not the focus of our debate today.").

[219] 2020 Rule, 85 Fed. Reg. at 35,182.

[220] *See* 2020 Rule, 85 Fed. Reg. at 35,182 ("In light of the aforementioned actions and resulting analysis, the NPS has revisited its approach regarding the authorizations that are the subject of this rule[.]").

[221] Docket 47 at 30 n.106.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 52 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 52 of 63

Congress does not enact a joint resolution of disapproval under section 802 respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule . . . or joint resolution of disapproval."[222]

Intervenor-Defendants respond that Section 801(g) means "that because Congress did not enact a joint resolution of disapproval for the 2015 NPS Rule, we can't infer any intent of Congress from that."[223] Intervenor-Defendants point out that there was a joint resolution of disapproval passed for the 2016 Refuges Rule, "[s]o Section 801(g) is inoperative" and "while we can't infer anything with regard to the 2015 Rule, we can infer with regard to the 2016 [Refuges] Rule," because Congress did enact a joint resolution of disapproval with respect to that rule such that 801(g) is inapplicable.[224]

At oral argument, Plaintiffs relied on the Ninth Circuit's recent opinion in *Safari Club International v. Haaland*[225] for the proposition that a joint resolution disapproving one rule does not indicate any congressional intent concerning another rule.[226] But the issue in *Safari Club* was whether a congressional joint

---

[222] 5 U.S.C. § 801(g).

[223] Docket 101 at 19:18–20:14.

[224] Docket 101 at 21:10–21:17.

[225] 31 F.4th at 1169-70.

[226] *See* Docket 101 at 7:11–7:17.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 53 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 53 of 63

resolution cancelling one rule can substantively amend Federal law such that another rule would be repealed by implication. The Circuit held that the scope of a joint resolution is narrow: it only cancels the rule at issue in the resolution.[227] In this case, however, NPS did not determine that the 2015 Rule was implicitly repealed by the joint resolution cancelling the Refuges Rule. Instead, NPS simply considered the congressional intent regarding hunting restrictions on Federal lands in Alaska as reflected in Congress' decision to cancel the Refuges Rule.[228]

Agencies routinely look to acts of Congress to infer congressional intent when conducting a rulemaking. Indeed, the legislative history of the CRA specifically directs agencies to do so, providing that "a court or agency must give effect to the intent of the Congress when such a resolution is enacted and becomes the law of the land."[229] The Congressional Record further explains that "Subsection 801(g) prohibits a court or agency from inferring any intent of the Congress *only* when 'Congress does not enact a joint resolution of disapproval.'"[230] In sum, because Congress passed a joint resolution cancelling the Refuges Rule, NPS is required to give effect to the intent of Congress when it did so, and therefore

---

[227] *See Safari Club Int'l*, 31 F.4th at 1169–70.

[228] *See* 2020 Rule, 85 Fed. Reg. at 35,182.

[229] 142 Cong. Rec. at S3686.

[230] 142 Cong. Rec. at S3686 (emphasis added).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 54 of 63

properly considered the joint resolution of disapproval of the Refuges Rule in the 2020 rulemaking.

### III. Bear Baiting

Plaintiffs criticize NPS's decision to allow bear baiting despite the agency's acknowledgment that these practices may result in human injury or death.[231] Plaintiffs note that in 2015, NPS prohibited bear baiting to avoid public safety issues associated with this practice. In that rule, NPS explained that bear baiting could food-condition bears and that these food-conditioned bears are "believed more likely to cause human injury."[232] However, the 2015 analysis did not engage with any data about the impacts of bear baiting on human safety. Rather, NPS simply stated then that its decision was "based on the legal and policy framework that governs national preserves and calls for maintaining natural ecosystems and processes and minimizing safety concerns presented by food-conditioned bears."[233]

In 2020, NPS performed a more robust analysis on bear baiting, relying on studies and the State's comments to conclude that the public safety issues

---

[231] *See* Docket 47 at 51–53.

[232] 2015 Rule, 80 Fed. Reg at 64,329.

[233] *See* 2015 Rule, 80 Fed. Reg at 64,336.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 55 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 55 of 63

associated with bear baiting are "expected to be rare."[234]  NPS acknowledged, as it must, that bear baiting has the potential to adversely impact public safety, especially if bears are attracted to bait stations and not harvested, due to the risk of food-conditioned bears.[235]  In the EA accompanying the 2020 Rule, however, NPS referenced a study explaining that bear baiting is unlikely to food-condition bears.  This is because bear baiting does not teach bears to associate bait with humans.  Although this study was premised on the theory of bear baiting, and not the practice of bear baiting, existing population data supports its conclusions.  Specifically, two studies found that bears exposed to bait were unlikely to become nuisance animals in both Manitoba and on the National Preserves of Alaska.  The latter study of black bear baiting in Alaska from 1992 to 2010 reported "[l]ittle to no population-level effects" and concluded that "bear baiting is centered on the management goals of minimizing food-conditioning of bears, fostering public safety . . . and maintaining processes and behaviors."[236]

NPS acknowledged one study to the contrary, which found that bear feeding to promote tourism in Quebec had population-level effects because it "may decrease the annual and seasonal ranges of bears and lead to a local increase in

---

[234] 2020 Rule, 85 Fed. Reg. at 35,188.

[235] *See* 2020 Rule, 85 Fed. Reg. at 35,188.

[236] Docket 85-2 at 154–55.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 56 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 56 of 63

bear density that may exceed the social carrying capacity."[237] NPS nonetheless concluded that the study of bear baiting in Alaska that found no public safety concerns was more directly applicable to the 2020 rulemaking than the study of bear baiting in Quebec for tourism purposes.[238] This conclusion survives judicial review because NPS rationally explained why it considered the Alaska study to be more persuasive than the Quebec study.[239] Moreover, three of the four scientific analyses discussed in the 2020 rulemaking support NPS's bear baiting conclusion.[240] And in the face of conflicting scientific studies, the Ninth Circuit requires a court to accord deference to an agency's scientific determinations, explaining that the courts are not "a panel of scientists empowered to instruct agencies on how to choose among scientific studies."[241]

NPS goes one step further, justifying its decision by explaining that "Alaska Department of Fish and Game regulations for bear bait stations will serve to mitigate risk to public safety."[242] But this additional step is one step too far because

---

[237] Docket 85-2 at 154.

[238] *See* Docket 85-2 at 154–55.

[239] *See In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017) ("[T]he agency must rationally explain why it did what it did.").

[240] *See* Docket 85–2 at 154–55.

[241] *Safari Club Int'l*, 31 F.4th at 1173 (citing *Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 578 (9th Cir. 2020)).

[242] 2020 Rule, 85 Fed. Reg. at 35,188.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 57 of 63

NPS overlooked, without explanation, its finding in 2015 that the State's bear baiting regulations were insufficient to protect public safety.[243]  In 2015, NPS explained that "[a]lthough there are State regulations that prohibit bait stations within a certain distance of structures (cabins/residences), roads, and trails, these distances lack biological significance relative to bears, whose home ranges can include tens to hundreds of square miles."[244]  As a result, the 2015 Rule determined that "[b]ecause of the accessibility of these areas, they are typically used by multiple user groups, which contributes to the public safety concerns associated with baiting."[245]

In 2020, NPS concluded that these same "Alaska Department of Fish and Game regulations for bear bait stations will serve to mitigate risk to public safety."[246]  But the 2020 Rule fails to mention, let alone engage with the agency's finding to the contrary in 2015.  In this respect, the 2020 Rule fails *Fox*'s first and fourth requirements because NPS changed its position without displaying any awareness that its new position contradicted the position it took in 2015 and

---

[243] *See* Docket 47 at 52.

[244] 2015 Rule, 80 Fed. Reg. at 64,336.

[245] 2015 Rule, 80 Fed. Reg. at 64,336.

[246] 2020 Rule, 85 Fed. Reg. at 35,188.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 58 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 58 of 63

without providing any reason, let alone a good reason, for reaching the opposite result.[247]

Plaintiffs maintain that this error is especially egregious because evidence in the record "demonstrates abysmal compliance with baiting regulations on the Preserve where baiting had been most common: Wrangell-St. Elias."[248]  Beginning in 1996, 73% of the bait stations existing along the McCarthy Road were found to violate State or Federal law.[249]  NPS in the 2020 Rule did not reference any data that would support the agency's conclusion that State's bear baiting regulations help ensure public safety.  In short, the agency did not explain its change in position with regard to the mitigating effect that State regulation of bear baiting may have on public safety.

## IV.    Remedy

NPS committed three errors in promulgating the 2020 Rule.  First, the 2020 Rule is not in accordance with law because NPS incorrectly restricted its statutory authority to regulate hunting on National Preserves in Alaska to only a "closure authority," even though the agency has plenary authority to protect the national

---

[247] *See Fox*, 556 U.S. at 515–16.

[248] Docket 47 at 52.

[249] *See* Docket 85-4 at 17.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 59 of 63

interest in Federal public lands.[250]  Second, the 2020 Rule is arbitrary and capricious because NPS incorrectly equated its Management Policies requiring the agency to manage wildlife "for self-sustaining populations" with the State of Alaska's "sustained yield" principle.[251]  Third, the 2020 Rule is arbitrary and capricious because NPS disregarded without explanation its conclusion in 2015 that State regulations fail to adequately address public safety concerns associated with bear baiting.[252]  The agency action must be remanded.[253]

The remaining question is whether to vacate the 2020 Rule at this time or remand while leaving the 2020 Rule in place.  Ordinarily, when an agency fails to comply with the APA, a court will vacate the agency action and remand to the agency; but in rare instances when equity demands it, a regulation can be left in place.[254]  "[C]ourts are not mechanically obligated to vacate agency decisions that

---

[250] *Compare* 2020 Rule, 85 Fed. Reg. at 35,182, 35,184, & 35,187 *with Safari Club Int'l*, 31 F.4th at 1165.

[251] 2020 Rule, 85 Fed. Reg. at 35,184.

[252] *Compare* 2015 Rule, 80 Fed. Reg. at 64,336 ("Although there are State regulations that prohibit bait stations within a certain distance of structures (cabins/residences), roads, and trails, these distances lack biological significance relative to bears, whose home ranges can include tens to hundreds of square miles.") *with* 2020 Rule, 85 Fed. Reg. at 35,188 ("Alaska Department of Fish and Game regulations for bear bait stations will serve to mitigate risk to public safety.").

[253] *See* 5 U.S.C. § 706(2).

[254] *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 60 of 63

they find invalid."[255]  "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[256]

Defendant-Intervenors maintain that if a remand is warranted, it should be without vacatur.  Defendant-Intervenors contend that "[i]t would be incongruous to grant a remedy that judicially reinstates the 2015 NPS Rule that bears such remarkable similarities to a rule subsequently abrogated by Congress under the CRA."[257]  Defendant-Intervenors also point out that NPS stated its intention to reconsider these issues in a new rulemaking and that NPS requested remand without vacatur.[258]  Plaintiffs respond that NPS made "serious and harmful errors" and that "vacatur would re-establish the Service's long-held position."[259]

With regard to the seriousness of the agency's errors, one important consideration is whether the agency's errors risk environmental harm.[260]  For

---

[255] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, it is not required to set aside every unlawful agency action."); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405 ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

[256] *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 142, 150–51 (D.C. Cir. 1993)).

[257] Docket 81 at 51.

[258] *See* Docket 81 at 51.

[259] Docket 47 at 53.

[260] *See Pollinator Stewardship Council*, 806 F.3d at 532.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 61 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 61 of 63

example, the Ninth Circuit upheld a decision to remand without vacatur the listing of a snail species as endangered so as to avoid the potential extinction of the species.[261]  The Ninth Circuit remanded with vacatur a rule to avoid harm to certain "precarious" bee populations while the matter was again before the agency.[262]  In this case, despite NPS's errors, substantial evidence supports the agency's conclusion that the 2020 Rule will cause only a low level of additional take of predators and will not alter the abundance of both predator and prey populations in the National Preserves.[263]   This factor accordingly weighs against vacatur.

With regard to the disruptive consequences, NPS has informed the Court on several occasions that it has already begun the process of reassessing the 2020 Rule.[264]  It would therefore be disruptive to vacate the 2020 Rule with a new rule apparently on the near horizon.   This factor also weighs against vacatur. Therefore, the agency action is remanded without vacatur.

---

[261] *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1405-06.

[262] *Pollinator Stewardship Council*, 806 F.3d at 532.

[263] *See* 2020 Rule, 85 Fed. Reg. at 35,188.

[264] *See* Docket 50; Docket 52 at 1 (Memorandum from Assistant Sec'y for Fish & Wildlife & Parks to Dir., Nat'l Park Serv. (Feb. 17, 2022)); Docket 64.

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 62 of 63

**CONCLUSION**

For the reasons expressed herein, Plaintiffs' *Motion for Summary Judgment* at Docket 47 is GRANTED IN PART and DENIED IN PART because the 2020 Rule violated the Administrative Procedure Act in three respects:

- NPS acted contrary to law insofar as it determined that its statutory authority to regulate hunting on the National Preserves of Alaska is restricted to a "limited closure authority" and that ANILCA mandates that NPS defer to State hunting regulations.

- NPS's finding that State of Alaska's and Federal wildlife management requirements are equivalent is arbitrary and capricious.

- NPS's disregard without explanation of its conclusion in 2015 that State regulations fail to address public safety concerns associated with bear baiting is arbitrary and capricious.

IT IS ORDERED that this action is REMANDED WITHOUT VACATUR to NPS for further proceedings consistent with this order. The Clerk of Court shall enter a final judgment accordingly.

DATED this 30th day of September, 2022, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:20-cv-00209-SLG, *Alaska Wildlife Alliance, et al. v. Haaland, et al.*
Order re Motion for Summary Judgment
Page 63 of 63

Case 3:20-cv-00209-SLG   Document 103   Filed 09/30/22   Page 63 of 63